Joseph ROSSI, Rossi Florence Group,
and Rossi Roofing, Inc.

v.

STANDARD ROOFING, INC., et al.

Civil Action No. 92–5377.

United States District Court,
D. New Jersey.

March 26, 1997.

Joseph A. Dickson, Clemente, Dickson & Mueller, P.A., Morristown, NJ, Harold E. Kohn, Joanne Zack, Michael J. Boni, Kohn, Swift & Graf, P.C., Philadelphia, PA, for Plaintiffs Joseph Rossi, Rossi–Florence Corporation, Rossi Roofing, Inc.

Steven Richman, Herrick, Feinstein, Princeton, NJ, for Defendant Wood Fiber Industries.

Joel N. Kreizman, Evans, Osborne, Kreizman & Bonney, Little Silver, NJ, for Defendants, Standard Roofing, Inc., William Higginson, The Estate of Robert Higginson, Joseph Licciardello.

Stuart Kuritsky, Bursik, Kuritsky & Giasullo, West Orange, NJ, for Defendants Arzee Supply Corporation, Alvin Roth, Cary Roth.

Sheldon M. Finkelstein, Shirley L. Berger, Hannoch Weisman, Roseland, NJ, for Defendant GAF Building Materials Corporation.

Stephen F. Ban, Laurel S. Gleason, Springer, Bush & Perry, Pittsburgh, PA, for Defendant Servistar Corporation.

POLITAN, District Judge.

Dear Counsel:

This matter comes before the Court on motions by defendants—Standard Roofing, Inc., Arzee Roofing Supply Corp., GAF Corporation, Allied Roofing, Inc., Servistar Corp., Robert Higginson (deceased), William Higginson, Alvin Roth, Cary Roth, Joseph Licciardello, and Wood Fibre Industries, Inc.—for summary judgment dismissing the Complaint of plaintiffs, Joseph Rossi, Rossi Florence Corp., and Rossi Roofing, Inc. Oral argument was heard on the motion on October 23, 1996, and the parties thereafter provided the Court with additional submissions. For the reasons outlined herein, defendants' motions are **GRANTED.**

### STATEMENT OF FACTS

Notwithstanding the voluminous nature of the parties' submissions in this case, the factual basis of the dispute is fairly straightforward, if somewhat lengthy.

Plaintiff Joseph Rossi ("Rossi") has been working in the roofing and siding distribution market in northern New Jersey ("North Jersey") since 1972. Plaintiffs Rossi–Florence Corp. ("Rossi–Florence") and Rossi Roofing, Inc., ("Rossi Roofing") are siding and roofing distributors that Joseph Rossi formed in North Jersey. They are no longer in busi-

ness. For ease of reference, the entities that are plaintiffs in this action will be referenced as either "Rossi" or "plaintiff."

Defendants Standard Roofing, Inc., ("Standard") and Arzee Supply Corporation ("Arzee") are distributors of roofing and siding materials in North Jersey. Defendants GAF Corporation[1] ("GAF") and Wood Fiber Industries, Inc., ("Wood Fiber") are suppliers of roofing products in North Jersey. Defendant Servistar Corp. ("Servistar") is a buying group, with some roofing and siding distributors as members, doing business in northern New Jersey.

Defendant William Higginson is currently a shareholder and President of Standard; defendant Joseph Licciardello is Vice President of Standard; defendant Alvin Roth is a shareholder and the President of Arzee; defendant Cary Roth is Alvin's son and a branch manager at Arzee.

Standard employed Rossi from 1972 until he was terminated in September of 1988, at which time he was the manager of Standard's Cedar Knoll branch. The reasons for his discharge are in dispute. Rossi alleges that Standard fired him because he refused to obey Standard's request to cooperate with Arzee in setting prices. Standard claims that Rossi was fired because of his poor work performance, Standard's high payroll expense (which it attributed to Rossi), Rossi's personal expenses charged to Standard, his concentration on his extraneous business ventures to the detriment of Standard, and the failure of the Cedar Knolls branch to achieve profits commensurate with its sales.

Immediately after Standard fired Rossi, he began planning to open his own roofing and siding distributorship at a building he owned, which was located adjacent to Standard and on the same block as Arzee. Because of his employment at Standard, Rossi had knowledge about off-invoice, volume and nonvolume confidential rebates that some distributors get from many of the manufacturers in the roofing and siding industry. These rebates are periodic credits against purchases that the manufacturer issued to the distributors. Rossi alleges that distributors and suppliers feared that he would pass these rebates on to his customers, thereby lowering the prices of roofing and siding products in northern New Jersey.

Rossi believes that because of his past refusal to participate in price fixing, his aggressive pricing, and his potency as a competitor, Standard and Arzee, together with Allied, agreed to prevent Rossi from succeeding as a competitor in the northern New Jersey roofing and siding market. Additionally, Rossi contends that those defendants caused suppliers, including manufacturers, other distributors and buying groups to refuse to deal with Rossi–Florence, Rossi Roofing, and Joseph Rossi.

Rossi asserts that in late 1988 or 1989, representatives of various manufacturers informed him that distributors Standard, Allied, and/or Arzee pressured manufacturers not to deal with Rossi. Rossi alleges that he entered into a joint business venture with Richard Droesch, President of the Florence Corporation (a roofing, siding, and window distributorship located at Huntington, Long Island), because Florence Corporation already had product lines. Jon Bieselin, an employee of Droesch, also entered into the business arrangement. On December 1, 1988, the three incorporated the Rossi–Florence Corporation in the State of New Jersey.

Rossi proffers several statements by various persons to support his contention that defendants conspired to keep him out of business. Specifically, Rossi claims that Licciardello, Vice–President of Standard, visited him in December of 1988 at the new business location and informed him that, if he went into business, Standard and Arzee "would do anything they could to keep him out of business." Additionally, a Standard employee testified that he heard Higginson state that Higginson intended to stop Rossi from competing against him.

---

**1.** GAF was Standard's major supplier of roofing products in the 1980s. Standard was also GAF's major customer in New Jersey and one of its top five customers nationwide. Standard bought over $7.7 million worth of GAF product from GAF in New Jersey in 1989, substantially more than any other customer in New Jersey.

Moreover, plaintiff contends that sometime in January of 1989, Bud Krusa of GAF called Droesch and told him that GAF would not sell to Rossi–Florence in New Jersey because GAF had sufficient distribution in the area. Plaintiff purports that Droesch responded to Krusa's statement by stating that he would sell GAF product from Florence Corporation to Rossi–Florence. Plaintiff maintains that Krusa then threatened Droesch by stating that GAF would no longer sell to Florence in Long Island if he sold GAF products to Rossi–Florence.

Plaintiff asserts that subsequent to Krusa's threat, a similar incident occurred in 1988 in connection with Certainteed, a major siding supplier to both Droesch's Long Island corporation and Arzee. Plaintiff alleges that Droesch received a call from Al Roth of Arzee in December of 1988. During that conversation, Roth allegedly asked Droesch if he was opening a distributorship with Joe Rossi in North Jersey. When Droesch responded affirmatively to that question, Al Roth then stated that he was not happy about it and threatened to open a distributorship in Long Island if Droesch followed through with the Rossi–Florence distributorship.

In January of 1989, Droesch informed Rossi that he wanted to withdraw from Rossi–Florence because he believed that their corporation would not have the necessary product lines to succeed and that the available substitute products would not suffice. He also told Rossi that he was worried that if he moved forward with their joint venture, his own business in Long Island would be endangered. Joe Rossi and Droesch then reached an agreement whereby Rossi would return $65,000 to Droesch and Bieselin and discontinue use of the Florence name.

After the breakup of Rossi–Florence, Rossi Roofing was incorporated in New Jersey on February 2, 1989, with Joe Rossi and Georgia Rossi as the corporate directors. Rossi Roofing obtained a $900,000 bank credit line, which was guaranteed by Joe and Georgia Rossi. In March of that same year, Anthony Lipari invested in Rossi Roofing with the intention that he would be a 50% shareholder.

Rossi Roofing was able to buy vinyl siding and roofing products from the Bird Corporation, a manufacturer. However, Rossi contends that he was unable to buy roofing product from Celotex, another manufacturer that supplied Standard, Arzee, and Allied. The representative of Celotex said that he could not sell to Rossi because it would not be allowed by his boss.

Though Rossi Roofing was able to directly secure products from some manufacturers, for example, Gold Bond and Bird, it was unable to get products from some other manufacturers. Manufacturers including Certainteed, Wolverine and Wood Fiber refused to sell their products to Rossi Roofing. Rossi contends that the manufacturers refused to deal with him because of pressure exerted on them by defendant distributors. Because Rossi Roofing was unable to purchase the products it wanted directly from manufacturers, it attempted and actually succeeded in buying some of them through other distributors.

In March of 1989, Rossi Roofing purchased GAF product from Passaic Metals, a roofing and siding distributor in North Jersey. After learning this, Bill Higginson of Standard called his competitor, Frank Gurtman, the President of Passaic Metals, and threatened to open a branch near Passaic Metals and put him out of business if Gurtman continued to sell to Rossi. Shortly thereafter, Gurtman explained to Rossi that he could not sell him product because he feared retaliation. However, Gurtman did sell some products to Rossi Roofing after Rossi convinced him to do so.[2]

Rossi also bought GAF product from Di-Naso & Sons, a roofing and siding distributor located in Staten Island. Plaintiff purports that DiNaso's GAF salesmen visited DiNaso & Sons during 1989 and asked them not to sell to Rossi. Despite their request, DiNaso sold GAF product to Rossi.

During the Spring of 1989, Rossi Roofing obtained GAF slatelines from DiNaso & Sons for a job that both Rossi Roofing and Stan-

---

**2.** Passaic did not sell Rossi any GAF products    until September of 1989.

dard were competing for on the James Street Commons Condominium project. Rossi Roofing sold the GAF slatelines roofing product to roofing applicator John Feher for the job. A Standard salesperson apparently learned from John Feher that he purchased GAF product through Rossi Roofing.

When Rossi Roofing attempted to purchase more slatelines for the James Street Common Condominium project from DiNaso, DiNaso told Rossi Roofing there would be a $1.00/sq increase in the price, as GAF had increased DiNaso's price for slateline. Thus, Rossi Roofing was unable to supply James Street Commons with the additional GAF slatelines it needed for subsequent buildings because of the increased price.

In July of 1989, Rossi Roofing entered into a Membership Agreement with the buying group Hardware Wholesalers, Inc. ("HWI"). Rossi Roofing joined HWI because it could not get the products Rossi Roofing needed directly from manufacturers.

On July 26, 1989, Rossi Roofing placed an order for GAF product with David Heine, Division Manager of Commodities at HWI. Part of the order was scheduled to be picked up the next day. When a Rossi Roofing employee went to pick up the partial order, he was advised by GAF Shipping Department employee Ken Rupert that his superior, District Sales Manager Bud Krusa, had decided that GAF would not release the order to Rossi Roofing.

Joe Rossi went with his attorney, Joseph Gioia, to the South Bound Brook Facility where the order was being held. After speaking with several HWI and GAF employees, Rossi then spoke to Krusa by the telephone. Krusa told Rossi, "I am not selling to you. The distribution is filled. GAF requires no other distributors." Rossi Roofing never obtained GAF product directly through GAF or through HWI. Instead it had to resort to buying the shingles from Strober Supply[3] at a marked-up price.

On August 4, 1989, Rossi Roofing went to the Celotex plant to pick up an order placed

through HWI. Celotex failed to supply the order, stating that it was a mistake.[4]

Another company of which Joe Rossi was a principal, Far Hills Lumber and Hardware Corporation, also known as L.V. Ludlow & Co. ("Far Hills"), joined the buying group Servistar on July 31, 1989. Rossi attempted to buy GAF product for Rossi Roofing through Far Hills and Servistar.

On August 2 and 3, 1989, Far Hills placed orders for GAF Timberlines through Servistar's Building Materials Department. Rossi had Far Hills place the GAF orders for the purpose of reselling the GAF product to Rossi Roofing. These orders were filled by GAF and resold by Far Hills to Rossi Roofing. After this transaction was completed, GAF employee Mary Lou Sperr heard that Rossi Roofing was connected to Far Hills.

Standard's Cedar Knolls/Morristown Branch Manager, Joseph Licciardello, also learned that Rossi Roofing had purchased GAF product from Far Hills. Jorge Esteves, a Standard employee, heard Licciardello state that "That's the last time we're going to be seeing any GAF across the street. They got the—they were getting the loads through Ludlow [Far Hills], which is American Hardware [the prior name of Servistar]. That's how Joe Rossi was getting GAF and he's going to put an end to that. 'Never going to see another GAF load across the street.'"

On August 11, 1989, Far Hills placed another order of GAF product through Servistar. On August 14, 1989, a Servistar employee informed Far Hills that the GAF order would not be filled, and that GAF had cut Far Hills off from getting GAF product because of Joe Rossi's involvement with Far Hills.

Defendant Wood Fiber manufactures Structodek FS. Structodek FS is a product with a membrane attached which commercial roofers use to eliminate the need to lay a separate underlayment before applying a built-up bitumen-type roof over a rough sur-

---

3. Strober had already been called by GAF instructing them not to sell the shingles to Rossi Roofing.

4. It is not clear whether plaintiffs are contending that this incident was caused by any of the defendants.

face. Joe Rossi asked Carl Loser of Wood Fiber to sell their products to Rossi Roofing. Loser told Rossi there was pressure from Allied and Standard not to sell to Rossi and that he did not think he could sell to Rossi Roofing.

Despite Loser's negative response to Rossi's request, Rossi Roofing ordered a trailer load of Structodek FS in June of 1989. Structodek gave Rossi Roofing a ship date of July 5th. On June 27, 1989, Carl Loser informed Rossi Roofing that they could not ship the material to him because it was in a difficult position.

At the end of Rossi Roofing's fiscal year, September 30, 1989, Rossi Roofing had lost approximately $350,000. Having been unable to buy GAF and other products, Rossi saw no possibilities of getting the products he needed to allow Rossi Roofing to succeed.

On December 18, 1989, Joseph Rossi, Rossi Roofing, and American Builders & Contractors Supply Co., Inc., ("ABC Supply") entered into an Asset Purchase Agreement pursuant to which ABC Supply agreed to purchase the assets of Rossi Roofing. The sale of Rossi Roofing's assets to ABC Supply occurred on January 8, 1990.

Joseph and Georgia Rossi were also sued on their personal guarantees for uncollected accounts receivables of Rossi Roofing by a number of Rossi Roofing's creditors. Joseph Rossi is still personally paying off the debt owed to the bank on the Rossi Roofing's line of credit.

On January 8, 1990, ABC opened it doors to the public and hired Joseph Rossi to manage the branch. The Morristown/Cedar Knolls location which Rossi managed for ABC did over $5.5 million in sales in 1990, its first year of operation. During 1993, the fourth and final year Rossi managed that location, the sales had increased to over $11 million.

On January 31, 1994, Jim Murray, ABC's District Manager, came to the Morristown/Cedar Knolls location and announced that ABC was selling that location to Bradco Supply. Consequently, Rossi later negotiated an agreement with Allied Building Supply. Allied opened a location on Rossi's property in 1994, committed to a lease, and employed Rossi as a manager of that location.

## DISCUSSION

### Summary Judgment

The standard governing summary judgment motions is set forth in Fed.R.Civ.P. 56(c), which provides in pertinent part:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The movant has the initial burden of identifying evidence that it believes shows an absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When the nonmovant will bear the burden of proof at trial, the movant's burden can be discharged by showing that there is an absence of evidence to support the nonmovant's case. *Id.* at 325, 106 S.Ct. at 2554. If the movant establishes the absence of a genuine issue of material fact, the burden shifts to the nonmovant to do more than "simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A party opposing summary judgment may not rest merely upon "bare assertions, conclusory allegations or suspicions." *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981). The proof must amount to more than a "scintilla" of factual support for the plaintiff's theory of legal recovery. *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1197 (3d Cir.1995).

Summary judgment is no longer looked upon as a disfavored procedural "shortcut"; rather, it presents the district court "with the first opportunity to dispose of meritless

cases." *Big Apple BMW, Inc. v. BMW of North Amer., Inc.*, 974 F.2d 1358, 1362 (3d Cir.1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). "This is true even in antitrust cases, 'where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.'" *Id.* (quoting *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)).

After oral argument in this matter, the Court requested that the plaintiff marshal the facts he maintains support his contention that there was an antitrust violation by the defendants in this case. The plaintiff was, in effect, given the opportunity to present what Judge Fullam, and subsequently Judge Mansmann, referred to in *Big Apple* as those "19 bits" of evidence tending to support an antitrust violation. *See Big Apple*, 974 F.2d at 1374 n. 11.

Even after this opportunity, however, the plaintiff has failed to provide any evidence from which a reasonable inference may be drawn that defendants engaged in an antitrust violation. Plaintiff's evidence consists primarily of conclusory allegations or suspicions. Although it is not necessary that the plaintiff eliminate every possible independent justification by the manufacturer/distributor so that only evidence of concerted action remains in the record, plaintiff must at least produce "evidence that tends to exclude the possibility of independent action by the manufacturer and distributor." *See Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775, *reh'g denied*, 466 U.S. 994, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984).

Antitrust law limits the "range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. More particularly, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* This is because "mistaken inferences in such a context 'are especially costly'" and "'chill the very conduct the antitrust laws are designed to protect.'" *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1001 (3d Cir.1994) (quoting *Matsushita*, 475 U.S. at 594, 106 S.Ct. at 1360), *cert. denied*, —— U.S. ——, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995).

The evidence must be analyzed as a whole, and not taken piecemeal, in determining whether an inference of concerted action is supported. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Plaintiffs in antitrust cases must be afforded the "full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id.* at 699, 82 S.Ct. at 1410.

*Sherman Act Claims*

■ Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Whether conduct violates the Act is determined on a case-by-case application of the Rule of Reason if it is not a *per se* case. *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1518–19, 99 L.Ed.2d 808, *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1727, 100 L.Ed.2d 192 (1988).

In order to prove a claim brought under section 1 of the Sherman Act, a plaintiff must prove:

(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and conduct pursuant to the contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991) (quoting *Tunis Bros. Co. v. Ford Motor Co.*, 763 F.2d 1482, 1489 (3d Cir.1985)). At the outset, the Court notes that there is some confusion regarding plaintiff's contention as to whether he is alleging that there was a horizontal or vertical restraint of trade. In plaintiff's motion papers, the contention is that the case is purely

one of horizontal refusal to deal with plaintiff. At oral argument, however, plaintiff's counsel conceded that there were various levels of parties involved in the case, but still contended that this case is a group boycott that was generated at the horizontal level.

The allegations here are similar to those addressed in *Big Apple,* where it was held that the agreement between the dealers, even though the agreement included the manufacturer, was enough to make it a horizontal restraint. *Big Apple,* 974 F.2d at 1376. Because the Third Circuit has determined that a similar factual scenario represents a horizontal restraint, this Court will analyze the case *sub judice* in that vein.

The distinction is important, because plaintiff alleges that this case presents a *per se* violation of section 1 of the Sherman Act. The Supreme Court has stated:

> "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use," and ... group boycotts are of this character.

*United States v. General Motors Corp.,* 384 U.S. 127, 146, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966) (quoting *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). A *per se* case can also be established where there is a horizontal or vertical price fixing agreement.[5] *See, e.g., Business Elecs.,* 485 U.S. at 723, 108 S.Ct. at 1518–19. Although explicit agreement is not necessary to prove a Sherman Act conspiracy, a conspiracy is evident where there is "joint and collaborative action" which is "pervasive in the initiation, execution, and fulfillment of the plan." *Id.* at 143, 86 S.Ct. at 1329.

For example, in *General Motors,* a group of automobile dealers had banded together to complain and force General Motors to put a stop to the practice of some dealers, who would resell their automobiles to discounters. General Motors was successful in persuading those dealers who were doing the selling to discounters to cease the practice. *Id.* at 132–38, 86 S.Ct. at 1323–27. The Supreme Court held that this concerted action by the group of dealers and General Motors was a *per se* violation of the Sherman Act. *Id.* at 145, 86 S.Ct. at 1330.

Similarly, in *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* the Supreme Court found a *per se* violation of the Act where "manufacturers and distributors of electrical appliances had conspired among themselves and with a major retailer ... 'not to sell to Klor's or to sell to it only at discriminatory prices and highly unfavorable terms.'" 359 U.S. 207, 209, 79 S.Ct. 705, 708, 3 L.Ed.2d 741 (1959).

The Supreme Court did, however, limit the application of the *per se* rule in a 1986 case. *Federal Trade Comm'n v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). Although it acknowledged its holdings in *General* Motors and *Klor's,* the Court determined that the *per se* approach should be "limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *Id.* at 458, 106 S.Ct. at 2018. *See also Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 298, 105 S.Ct. 2613, 2621, 86 L.Ed.2d 202 (1985) (holding that the "mere allegation of a concerted refusal to deal does not suffice [as a *per se* violation] because not all concerted refusals to deal are predominantly anticompetitive").

In this matter, there is no evidence that GAF determined not to sell to plaintiff on the basis of complaints received from the defendants, either individually or in concert. Although it is clear (and defendants Arzee and Standard admit) that they often complained about plaintiff's propensity to offer lower prices to his customers, plaintiff presents no

---

5. There is no evidence that this case presents a price fixing *per se* case, and the Court finds that it is not a price fixing case. Although plaintiff alleges that he was present at a lunch where the conversation involved setting prices, there is no evidence that price fixing ever occurred with regard to the two defendants against whom this allegation is made. Such an allegation, standing alone, is not enough to propel this case into the range of a *per se* violation.

proof that GAF was approached by a group of the defendant distributors regarding plaintiff's pricing. Nor is there any proof in the record from which an inference can be drawn that this occurred.

More importantly, there is no proof that GAF made its determination not to sell to plaintiff based on anything but a valid business decision. The evidence is clear that GAF felt that it had adequate distribution. A manufacturer may sell its product to whomever it chooses. *See, e.g., Monsanto,* 465 U.S. at 761, 104 S.Ct. at 1469; *Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367, 374 (3d Cir.1985); *Inter–City Tire & Auto Ctr. v. Uniroyal, Inc.,* 701 F.Supp. 1120, 1124 (D.N.J.1988), *aff'd without opinion,* 888 F.2d 1380 (3d Cir.1989). This, of course, is the touchstone of our free market economy.

■ Additionally, complaints about pricing by competitors to a manufacturer are normal; such is the nature of the beast of commerce.[6] Such complaints "are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals." *Monsanto,* 465 U.S. at 763, 104 S.Ct. at 1470. Even where a manufacturer acts in *response* to dealer complaints, not in concert with them, that is unilateral action and is not a *per se* violation of the Sherman Act. *See, e.g., Regency Oldsmobile, Inc. v. General Motors Corp.,* 723 F.Supp. 250, 263 (D.N.J.), *aff'd,* 888 F.2d 1380 (3d Cir.1989).

As stated *supra,* an explicit agreement is not necessary to prove a Sherman Act conspiracy. An agreement can be implied from the totality of the circumstances after considering the evidence as a whole. The copious amount of documents filed in this matter do not contain any circumstantial or direct evidence, as set forth more fully below, that "reasonably tends to prove that the [defen-

dants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471.

Many of plaintiff's allegations of a conspiracy that are supported by deposition testimony are centered around several of the defendants discussing plaintiff's chances of success as a competitor. There are also comments by competitors to plaintiff to the effect that he would "never make it" in his new business. Plaintiff also alleges that certain of the defendants would ask a GAF representative whether GAF was selling to plaintiff after he started his own business.

These allegations clearly do not allow this Court to infer that these conversations rose to the level of a conspiracy amongst any of the defendants. The inference to be drawn from the facts alleged by plaintiff in this matter is that certain of the defendants, particularly Standard and Arzee, had a strong aversion to Rossi and would protest anything that he did. But the missing link in the alleged conspiratorial chain is GAF. The conspiracy alleged is as to *all* defendants, yet no evidence has been adduced to allow this Court to draw the inference that GAF acted in concert with the other defendants.

Plaintiff has stated, both in his submissions to the Court and during oral argument, that *Big Apple* is directly on point in determining this matter. However, the factual scenario in *Big Apple* is completely different.[7] In *Big Apple,* there was "consistent evidence that BMW NA encouraged the Potamkins to acquire BMW dealerships, that the New York and Philadelphia dealers subsequently complained to BMW NA about the Potamkins, and that BMW NA later denied the Potamkins franchises giving allegedly pretextual reasons." 974 F.2d at 1365. There was evidence in that case of various meetings

---

6. As Bud Krusa from GAF testified:

Q. And you don't recall whether or not any of those conversations Mr. Roth complained to you about Mr.—any price that Mr. Rossi had on any particular job?

A. No different than anybody else complaining about the same thing, or Mr. Rossi calling about somebody else's prices. Everybody complained about everybody....

Krusa Dep., T22:25–T23:7.

7. Perhaps the most important distinction between the case *sub judice* and *Big Apple* is that, in *Big Apple,* the denial of the franchise to the plaintiff meant that the plaintiff could not even open its business. Here, plaintiff was in business and was able to obtain alternate products from other manufacturers.

between representatives of BMW North America and the Potamkins.

Equally distinguishable is the *Arnold Pontiac–GMC* case. *Arnold Pontiac–GMC. Inc. v. General Motors Corp.*, 786 F.2d 564 (3d Cir.1986). In that case, the plaintiff had an established business and there were a series of identifiable meetings and documents involving serious discussions with the defendant. *Id.* at 568–71. The dealer disapprovals arose after an initial meeting with the plaintiff and defendant to discuss whether the plaintiff had fulfilled all of the defendant's conditions for the new franchise. *Id.* at 573–74.

Here, GAF never promised or even made any overtures to Rossi that it would use him as a distributor of GAF products. It told him time and time again that distribution was filled. None of plaintiff's entities was ever an existing distributor of GAF products or products of the other manufacturer defendants. After leaving Standard, which did carry GAF products, Rossi attempted to start his own business. It was at that point that GAF maintained that it had adequate distribution in the area.

According to plaintiff, GAF supplied its roofing products to over twenty-five different distributors in New Jersey. A "unilateral decision of a single manufacturer to rearrange its distribution structure by limiting or increasing the number of its dealers or transferring the number of its dealers or transferring its business to different dealers does not violate the Sherman Act." *Seaboard*, 770 F.2d at 374.

Plaintiff can point to no evidence that would support its assertion that this was pretextual. Plaintiff had just started his business directly adjacent to Standard, an existing GAF distributor. An inference can certainly be drawn that because plaintiff was a start-up operation, with no "track record," GAF validly determined that it would not want to jeopardize its relationship with Standard.

Plaintiff does maintain that GAF began supplying ABC after he was told that GAF had adequate distribution, but the fact remains that ABC was an *existing, national* distributor of GAF products which opened in the area where plaintiff had his business. This conduct is as "consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. Such a business decision to continue working with a nationally competitive distributor fails to rise to the level of an antitrust violation. The antitrust laws are to be used as a shield against clearly anticompetitive activity, not as a rapier to avenge every hurt feeling a businessperson may feel that he has suffered at the hands of his competitors.

Parenthetically, GAF knew of Rossi's involvement with ABC during the time it continued to do business with ABC. If GAF and the other distributors had such a venomous animosity towards Rossi, it defies common sense that GAF, if it was participating in some sort of conspiracy, would sell to ABC's Cedar Knolls office if Rossi continued to be employed there. GAF certainly could have asserted its power and urged ABC to dismiss Rossi.

The Court therefore finds that there is no *per se* violation in this case. Moreover, the Court finds that there can be no inference drawn, looking at the evidence as a whole, that there was a conspiracy or agreement to prevent plaintiff from obtaining certain roofing products. It should be noted that although plaintiff alleges that "many manufacturers" refused to sell directly to plaintiff,[8] most of the proofs adduced by plaintiff are directed towards GAF. Such a bald allegation is clearly not enough for this Court to infer that all of the referenced manufacturers were involved in any agreement with any other party or parties not to sell to Rossi.

---

8. In plaintiff's opposition brief, it is alleged that GAF, Wood Fiber, Celotex, Certainteed, Wolverine, Atlas, Johns Manville, Suprador, Hastings Aluminum, U.S. Intec, Tamko, Karnak, Owens Corning, Vipco, and Nailite refused to sell product directly to plaintiff. Plaintiff only sued GAF, Certainteed, Wolverine, Nailite, and Wood Fiber. GAF and Wood Fiber are the only manufacturer defendants still remaining in the case.

■ In concluding its analysis of the "agreement" prong of the test, the Court should note and address at this point the specific allegations made by plaintiff with regard to the defendants other than GAF. Many of the allegations are of unilateral comments made by one defendant to Rossi. "Whether an unlawful conspiracy or combination is demonstrated should be judged by what the parties actually did rather than by the words they used." *Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp.*, 913 F.Supp. 1088, 1100 (N.D.Ill.1995).

Although the Court will point out plaintiff's allegations separately as to each defendant for purposes of addressing them, the evidence is not being pigeonholed or "compartmentalized." [9] Rather, this method of dealing with the facts will alleviate any potential obfuscation of the issues. The Court has painstakingly reviewed this record, and the supplemental submissions, and has considered all allegations together.

### Wood Fiber

■ Plaintiff alleges that Wood Fiber refused to sell to him because of pressure from distributors in the area, particularly Standard and Allied. What plaintiff actually testified to at his deposition was that from his conversations with Carl Loser, the Wood Fiber representative, he would "have to assume by what he said to me that they were getting pressure, but he didn't say, hey, we are not going to sell you right at the first go round." Rossi Dep., T368–69, attached as Exhibit EE to Certification of Steven M. Richman ("Richman Cert.").

Plaintiff states that he has proffered evidence that the distributor defendants interfered with potential suppliers, including Wood Fiber. With respect to Wood Fiber, however, plaintiff testified that he did not know for a fact whether Licciardello or Higginson called Loser at Wood Fiber, nor did Loser specify what pressure was being exerted on him.

It is clear that plaintiff's suppositions are not enough to allow an inference that Wood Fiber was engaged in some sort of agreement or conspiracy with the other defendants to deny plaintiff the products he sought. It must be remembered that a party may not rest upon "bare assertions, conclusory allegations or suspicions" to overcome a motion for summary judgment. *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981).

Plaintiff has not presented any evidence which shows that Wood Fiber met, or otherwise conversed, with any of the other defendants in this matter. Plaintiff had not applied for credit with Wood Fiber, a prerequisite to obtaining products directly from the company. Plaintiff merely speculates that some defendants were putting "pressure" on Wood Fiber, without ever particularizing what he means. Such "evidence" is woefully inadequate. Even if Wood Fiber determined not to sell to plaintiff based on other distributors' complaints about him, that reaction to criticism is not an antitrust violation.

### Servistar

■ There is a substantial lack of evidence adduced by plaintiff with regard to his allegations that Servistar "joined the conspiracy" when it refused to compel GAF to provide materials to it for purchase by Ludlow/Far Hills, a member of its purchasing cooperative. Servistar has maintained that the reason it did not order a second load of GAF product for Ludlow/Far Hills (after having ordered a large first load, which plaintiff's trucking company picked up directly from GAF's facility) was because Ludlow/Far Hills had failed to submit all of the promised personal guarantees from the partners. Therefore, in connection with the "shelf stocking" order Ludlow/Far Hills was to place, this second GAF shipment would have exceeded the credit limit set by Servistar.

Even assuming as true plaintiff's assertion that Servistar was "pressured" by GAF not to sell to Ludlow/Far Hills because of Rossi's connection, such pressure or refusal by GAF does not allow an inference that Servistar joined any conspiracy, which the Court has found does not exist in this matter. Rossi

---

9. This is to lessen plaintiff's concerns that defendants, in filing separate summary judgment motions, are in effect asking this Court to review in isolation plaintiff's evidence with respect to each defendant.

has testified that he was told by an unidentified Servistar employee that GAF would not ship the product because it was for Rossi and because GAF had adequate distribution. Rossi also speculates that it was a Servistar decision not to sell him the product. Servistar, however, would be unable to override GAF's decision because GAF was the manufacturer and GAF had the roofing products. Servistar was, in effect, the alter ego of its members.

Plaintiff has adduced no evidence that Servistar had conversations with any of the distributor defendants in this matter; therefore, any involvement in the "horizontal" conspiracy alleged by plaintiff is nonexistent.

### Standard Roofing, the Estate of Robert Higginson. William Higginson, and Joseph Licciardello

■ The evidence with regard to Standard is clearly the most particularized, perhaps due in large part to Rossi's previous employment relationship with Standard. Plaintiff alleges that he was terminated by Standard because of his refusal to "cooperate with his neighbors" in keeping prices level.[10] This termination occurred some two years before Rossi attempted to start his own business. The allegation of price fixing, moreover, makes very little economic sense, as plaintiff alleges only that Arzee and Standard were involved in the conversation. The roofing and siding market in northern New Jersey was very large. Common sense dictates that absent an agreement between most or all of the distributors, such an agreement to fix prices would be futile.

Furthermore, there is no proof as to actual price fixing. There is merely proof of conversations by and between certain competitors regarding prices. Plaintiff has testified that the market was incredibly competitive. It is axiomatic that this competition stimulates the urge to discover the prices being charged by one's competitors. Absent more tangible proof, this Court will not, and can not, make the vault to a conclusion of price fixing.

Plaintiff also points to statements made by Licciardello to the effect that he and Arzee would do anything they could to see Rossi's business fail. This unilateral statement by Licciardello does nothing to implicate any of the other defendants. Licciardello testified that he merely made the statement based on what he knew as the personal animosity felt by Arzee and Allied towards Rossi. A jousting match in the commercial arena is not sufficient to compel a finding of an antitrust violation. It is more than natural for competitors to discuss a third party's attempt to go into business. There is no proof presented of any concerted activity amongst Standard, Arzee and Allied.

Plaintiff next asserts that Standard tried to block his attempts at getting products from certain manufacturers. The evidence presented by plaintiff points to completely unilateral conduct by Standard. This Court requested that plaintiff marshal all of the facts revealing the concerted activity in this matter. Even the conversations between Standard and certain manufacturers, which did not rise to the level of concerted activity, were merely complaints by Standard with regard to Rossi's pricing strategies. Plaintiff points to evidence of conversations between Licciardello and representatives of Bird and Gold Bond where Licciardello complained about Rossi. Yet, these are two of the manufacturers who *did* sell to Rossi.

Plaintiff also alleges that Standard stopped purchasing from HiFinn after learning that HiFinn may have sold to Rossi. However, a distributor's decision to stop buying from a particular manufacturer is hardly evidence of a concerted activity. This is as far from concerted activity as one can get.

There is also evidence that Bill Higginson spoke with Francis Gurtman at Passaic Metals and threatened that if Passaic Metals sold to Rossi, Standard would open a business "right around the corner" and take all of Passaic Metal's customers. Licciardello called back shortly thereafter to apologize for Higginson, and Passaic Metals continued to do business with Rossi.

10. Although it appears that plaintiff testified in another proceeding that he did not know why he was terminated from Standard, this Court will not engage in a credibility determination on summary judgment.

With regard to evidence of an agreement between GAF and Standard, the most that plaintiff can produce is conversations between Licciardello and Bud Krusa, GAF's representative, or some other person at GAF. These unilateral conversations are not evidence of a horizontal conspiracy, nor are they even evidence of a vertical conspiracy, because there is no evidence of price fixing.

One such conversation, related through supposition by a Standard employee, was a query as to where Rossi was getting GAF materials. Other testimony to which plaintiff points involves conversations between distributors as to Rossi's discounting. Licciardello admitted that he had discussions with Bob Schaab at Standard about whether Rossi was going to open up his own business, because they were concerned that Rossi would affect the pricing in the area and might take business away from Standard.

The Court fails to see the significance in plaintiff's reliance on this testimony and other testimony like it. Common sense dictates that Standard would be an ineffective business venture if it were not concerned with the pricing of its competitors. Such a concern is commonplace, and evidence of conversations regarding that concern are simply not at the level of an antitrust violation.

Plaintiff also points to testimony regarding certain rebate programs utilized by GAF and other manufacturers. There is no inference which can be drawn that these programs are in any way linked to some sort of horizontal boycott or conspiracy. There are also allegations that individuals from Standard and Arzee used to sit in cars near Rossi's business to "spy" on him, but the testimony upon which plaintiff relies only mentions Arzee employees. The three businesses were in the same general location on the same street. It is only natural that one or more of his competitors might have been observing his business to identify Rossi's customers. It is not proof of any antitrust violation.

Finally, plaintiff alleges that his bid for an expansion was opposed by Standard and Arzee. There is testimony regarding Licciardello and Cary Roth being at the planning board meeting, and Cary Roth questioning why his similar request for an expansion had previously been denied. Licciardello did not even speak at the meeting. Such an interest in an expansion of a neighboring property is natural, and no inference can be drawn that such opposition is violative of the antitrust laws.

Taking into account the entirety of the preceding evidence, it is clear that any unilateral activity in which Standard might have been involved did not rise to the level of an antitrust violation. Business is just that: business. The fact that Standard may have complained about Rossi's pricing or the way in which he did business is a natural occurrence in the world of commerce. If such complaints, even if made on a daily basis, were antitrust violations, no doubt the federal courts would be faced with a maelstrom of lawsuits.

### Arzee, Alvin Roth, and Cary Roth

Plaintiff maintains that Arzee complained to GAF about plaintiff's pricing and that Alvin Roth was present at the lunch where Rossi alleges pricing was discussed while he was employed by Standard. In his allegations regarding Arzee, plaintiff cites to deposition testimony of Licciardello, which states that they were "going to be competitors and fight for every order." This testimony does nothing to implicate Arzee in any agreement.

Also, plaintiff alleges that Arzee and Standard fixed prices after he was "driven out of business." There is little of substance in these allegations, as much of the testimony amounts to supposition.

There is testimony that Arzee and Standard were "a nickel apart" on pricing for certain jobs. In a competitive industry, that nickel could very well mean the difference between getting a job and not getting a job. This "nickel" difference allows no inference of any agreement on prices. In fact, the same deponent said that Standard subsequently raised its prices.

Denise LeMattey, a Standard employee, testified that Licciardello called Cary Roth at Arzee to see why Arzee had quoted such a cheap price on a job. She also said that Arzee's prices were "around the same price"

as Standard's. Later in her testimony, she said that, when asked whether she had ever discussed prices with a competitor: "Sometimes after a job is given out, if I run into a salesperson I would ask him, how could you quote that price?" LeMattey Dep., T23:14–21. Such curiosity is not an antitrust violation.

*Rule of Reason Analysis*

■ Having found no evidence from which a conspiracy or agreement can be inferred as to any of the defendants, this Court's inquiry could be halted at this point, as the first element of proving a Section 1 claim is lacking. More importantly, the Court's inquiry at this point is finished because plaintiff has pled only a *per se* case, and summary judgment on the antitrust claims could be granted for that reason alone.

For the sake of completeness, however, the Court will liberally construe plaintiff's pleadings and analyze the facts presented by plaintiff under the rule of reason because "there is a presumption in favor of a rule of reason standard." *Business Elecs.*, 485 U.S. at 726, 108 S.Ct. at 1520 (stating that "departure from that standard must be justified by demonstrable economic effect, such as the facilitation of cartelizing, rather than formalistic distinctions").

From the beginning of this century, "a judicial gloss on [Section 1] has established the 'rule of reason' as the prevailing standard of analysis." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Under this standard of analysis, the finder of fact must weigh all of the given circumstances of a case in determining whether a restrictive practice must be prohibited as imposing an unreasonable restraint on competition. *Id.* The touchstone of the rule of reason test is proof of anticompetitive effect, and the goal of antitrust law is the protection of interbrand, not intrabrand, competition. *Id.* at 52, 97 S.Ct. at 2558.

■ The Court has already found that no agreement or conspiracy existed in this matter. Consequently, the next issue to be addressed under the rule of reason is the relevant product and geographic market. A relevant product market is defined as "those commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). The relevant product market in this matter is the entire market of roofing and siding materials. Plaintiff contends that GAF may be a "preferred" brand, but consumer preference is just that: a preference, and not a market. GAF is not so unique as to comprise its own "market." *See, e.g., id.; Mogul v. General Motors Corp.*, 391 F.Supp. 1305, 1313 (E.D.Pa. 1975), *aff'd without opinion*, 527 F.2d 645 (3d Cir.1976); *see also R.D. Imports Ryno Indus., Inc. v. Mazda Distrib. (Gulf), Inc.*, 807 F.2d 1222, 1225 n. 2 (5th Cir.), *cert. denied*, 484 U.S. 818, 108 S.Ct. 75, 98 L.Ed.2d 38 (1987); *Kingsport Motors, Inc. v. Chrysler Motors Corp.*, 644 F.2d 566, 571 (6th Cir.1981).

Plaintiff testified at his deposition that "there were approximately 30 roofing and siding distributors in North Jersey, not including the mass merchandisers, small lumberyards, you name it, hardware stores that might have roofing." J. Rossi Dep., Vol. I, T14:4–24. Additionally, it is agreed that the market in the "New Jersey/New York metropolitan area is probably one of the toughest, most competitive marketplaces in the country." *See* J. Rossi Dep., *American Builders & Contractors Supply Co.. Inc. v. Rossi*, T16:23–T17:1, attached as Exhibit 15 to Berger Cert.

The relevant market, to which the parties seemingly agree, is clearly the Northern New Jersey roofing and siding distributors market, and the relevant product market was the totality of the products in the roofing and siding line. The manufacturers of these products were numerous, as plaintiff readily admits. *See* J. Rossi Dep., Vol. I, T30:17–T31:1, T32:20–23; T33:17–18; T35:19–22; T37:8–11; T37:21–T38:5; T40:15–T44:5. The other manufacturers included Owens–Corning, Manville, Bird, Iko, Elk, Celotex, Tamko, U.S. Intec, Georgia Pacific, CertainTeed, Genstar, Nord Bitumi, and Tarmac. *See* Expert Report of Dr. Adam B. Jaffe, attached

as Exhibit A to Certification of Dr. Adam B. Jaffe, Exhibits 3 and 5.

To prove that a conspiracy or an agreement produced adverse, anticompetitive effects within the relevant product and geographic market, the impact on the market is the key focus, rather than on the individual participants in the market. "The antitrust laws were enacted for the protection of competition, not competitors." *Brown Shoe v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Plaintiff has not shown what exactly were the adverse anticompetitive effects to the northern New Jersey product market.

In a recent Second Circuit case, the court had before it a plaintiff who filed suit alleging that various distributors had complained to the defendant about its plan to sell exhaust systems to the plaintiff. *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir.1995).

The court affirmed the district court's granting of summary judgment for the defendants, stating that the plaintiff "bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Id.* at 127.

The Second Circuit found that there was no appreciable effect on either interbrand or intrabrand competition by Walker's refusal to supply the plaintiff. The plaintiff could not, therefore, shoulder its initial requirement of proof. Although in *K.M.B.* the court determined that the restriction was a vertical one, the court's analysis under the rule of reason is instructive. Where, as here, the plaintiff is unable to establish that any adverse effect on competition occurred, the antitrust laws are not violated. Even though plaintiff alleges that GAF was a preferred product in the roofing market, such "isolated statements of preference are not a sufficient 'empirical demonstration concerning the [adverse] effect of the [defendants'] arrangement on price or quality." *K.M.B.*, 61 F.3d at 128 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 n. 49, 104 S.Ct. 1551, 1567 n. 49, 80 L.Ed.2d 2 (1984)).

In *K.M.B.*, as here, there were many distributors of Walker (in this case GAF) products in the relevant geographic market. This provided for a fiercely competitive intrabrand market, and the GAF market in northern New Jersey also continues to be competitive. The fact that plaintiff was not permitted to compete in the market is not, alone, sufficient to show an adverse effect on intrabrand competition. More importantly, even though plaintiff was unable to get GAF products from GAF, he was able to carry, and indeed did carry, alternate products. The impact on the total interbrand market was therefore unaffected.

Plaintiff was able to get Wood Fiber products from sources other than the manufacturer, and did so on several occasions, reselling the product to its customer at a higher price. See Plaintiff's Admissions Nos. 1, 4, 10, 11, 12, 13, 15, attached as Exhibit L to Richman Cert. Rossi also obtained GAF products from other sources, albeit at prices slightly higher than what he purchased them for when he was at Standard. Plaintiff was also able to acquire products directly from Bird and Gold Bond, two manufacturers.

There is, looking at a totality of the evidence presented by plaintiff, no inference which can be drawn that there was any adverse, anticompetitive effect in the relevant geographic and product markets. The market continues to be one of the most competitive in the country with regard to roofing and siding products. The fact that one competitor may not have been able to carry products from a few manufacturers does not, absent proof of some illicit agreement or conspiracy, equal the harm against which the antitrust laws were designed to prevent. Plaintiff was able to acquire products necessary to engage himself in the competitive atmosphere of the northern New Jersey roofing and siding market. Plaintiff points to no evidence that the availability of other brands of products or the price of those products were affected negatively. Builders and other craftspersons were able to purchase the materials they wished from any number of distributors, and plaintiff has not alleged that the prices of those products were affected. Because comparable goods at competitive prices were

available in the market, there is no showing here of any anticompetitive effect. *See, e.g., Tunis*, 952 F.2d at 728.

The third part of the test—that the object of and the conduct pursuant to any agreement or conspiracy was illegal—is not met. Because the Court has determined, based upon a review of all of plaintiff's proffered evidence, that there was no agreement or conspiracy between or amongst any defendants in this matter, an analysis of this prong of the test would be repetitious.

█ The final question that need be answered is whether plaintiff was injured as a proximate result of any conspiracy. Even assuming, for this prong of the test only, that a conspiracy or agreement existed, plaintiff has pointed to nothing which would suggest that any business losses he sustained was related to any such agreement or conspiracy.

Plaintiff contends that he was injured in several ways.[11] First, he alleges that the defendants' actions prevented him from beginning operations of Rossi–Florence. Second, he alleges that Rossi Roofing suffered injuries because, during its entire time of operation, it was unable to obtain the roofing and siding materials it needed to compete.

These arguments are unsupported by the record. Damage claims must be presented in a manner that is not based on guesswork or speculation. See *Malley–Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 734 F.2d 133, 148 (3d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984). Plaintiff's damages expert, Regan R. Rockhill, CPA, based his damages estimates on a host of assumptions, the most basic assumption being that "the most appropriate way to look at what Mr. Rossi would have done in operating his own business is that he would have essentially followed the business practices he had followed the prior 14 years while at Standard Roofings." Report of Regan R. Rockhill, attached as Exhibit P to Richman Cert., at 2.

The paradigm utilized by Rockhill amounts to nothing more than a "but for" damage model. Rossi had no experience in his own business. Rockhill never analyzed what products were needed to assure a successful distributorship, and there is no proof as to causation. Perhaps most importantly, Rockhill failed to engage in any analysis regarding the impact of any defendants in the case to determine what harm, if any, was caused by the alleged antitrust actions as opposed to other factors, such as Rossi's management style or general business conditions. Rockhill does not specify any products in his report, and he did not separate any damages attributable to Rossi–Florence and Rossi Roofing.

█ Where a plaintiff fails to present evidence which provides a sufficient basis for an award of damages, it cannot recover. An award of damages must be proved to the point where they can be determined by reasonable inference, not by speculation or guess. A court must be able to connect any damages to the conduct of the defendant. See *Van Dyk Research Corp. v. Xerox Corp.*, 478 F.Supp. 1268, 1327–28 (D.N.J.1979), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). *See also Southern Pacific Communications Co. v. American Telephone. & Telegraph Co.*, 556 F.Supp. 825, 1090 (D.D.C.1983), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985) (holding that a "but for" damage model is "fatally deficient" where it provides "no basis for the Court to determine without speculation the amount of damage, if any, caused by any of the particular actions of the defendants").

For the reasons above, the Court finds that plaintiff's damages model is deficient as a matter of law.

### CONCLUSION

Based upon the foregoing, the motions made by defendants—Standard Roofing,

---

11. Although defendants have raised an issue regarding Joseph Rossi's individual standing as a plaintiff, the Court need not reach that issue. He acted at all times through his corporation, and he alleges that he was damaged by the inability of Rossi Roofing to get product. He also was allegedly damaged by his inability to utilize his own funds or obtain alternative financing after the failure of Rossi–Florence/Rossi Roofing. Because the Court has found that no antitrust violation exists, it will not engage in the standing analysis described by the Third Circuit in *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1165–66 (3d Cir.1993).

Inc., Arzee Roofing Supply Corp., GAF Corporation, Allied Roofing, Inc., Servistar Corp., Robert Higginson (deceased), William Higginson, Alvin Roth, Cary Roth, Joseph Licciardello, and Wood Fiber Industries, Inc.—for summary judgment dismissing plaintiff's Complaint are **GRANTED**. Plaintiff's Complaint is therefore **DISMISSED WITH PREJUDICE.**

An appropriate Order accompanies this Letter Opinion.

### *ORDER*

This matter, having come before the Court on motions by defendants—Standard Roofing, Inc., Arzee Roofing Supply Corp., GAF Corporation, Allied Roofing, Inc., Servistar Corp., Robert Higginson (deceased), William Higginson, Alvin Roth, Cary Roth, Joseph Licciardello, and Wood Fiber Industries, Inc.—for summary judgment dismissing the Complaint of plaintiffs, Joseph Rossi, Rossi Florence Corp., and Rossi Roofing, Inc.; and oral argument having been heard on the motion on October 23, 1996; and the parties thereafter having provided the Court with additional submissions; and for good cause shown, as more fully set forth in the accompanying Letter Opinion;

IT IS on this 26th of March, 1997,

**ORDERED** that defendants' motions for summary judgment be and are hereby **GRANTED**; and it is further

**ORDERED** that plaintiffs' Complaint be and is hereby **DISMISSED WITH PREJUDICE.**