

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-1998

# Rossi v. Standard Roofing Inc (Part I)

Precedential or Non-Precedential:

Docket 97-5185

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Rossi v. Standard Roofing Inc (Part I)" (1998). *1998 Decisions.* Paper 224.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/224

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 1 of 2

Filed September 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-5185

JOSEPH ROSSI; ROSSI FLORENCE, CORP.;
ROSSI ROOFING, INC.,
Appellants

v.

STANDARD ROOFING, INC.; ARZEE ROOFING SUPPLY
CORP.; GAF CORPORATION; ALLIED ROOFING, INC.;
SERVISTAR CORP.; ROBERT HIGGINSON; HARDWARE
WHOLESALERS, INC.; WILLIAM HIGGINSON;
CERTAINTEED CORP.; WOLVERINE CORP.; NAILITE
CORP.; ESTATE OF ROBERT HIGGINSON; AL ROTH;
CARY ROTH; JOSEPH LICCIARDELLO; WOOD FIBRE
INDUSTRIES, INC.

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 92-cv-05377)

Argued: November 6, 1997

Before: BECKER, ROTH, Circuit Judges and
DIAMOND, District Judge.*

(Filed September 9, 1998)

_____

* Honorable Gustave Diamond, United States District Judge for the
Western District of Pennsylvania, sitting by designation.

HAROLD E. KOHN, ESQUIRE
JOANNE ZACK, ESQUIRE
  (ARGUED)
MICHAEL J. BONI, ESQUIRE
Kohn, Swift & Graf, P.C.
1101 Market Street, Suite 2400
Philadelphia, PA 19107

JONATHAN D. CLEMENTE,
 ESQUIRE
Clemente, Dickson & Mueller, P.A.
218 Ridgedale Avenue
P.O. Box 1296
Morristown, NJ 07962-1296

Attorneys for Appellants
Joseph Rossi, Rossi Florence Corp.,
and Rossi Roofing, Inc.

ROBERT C. HEIM, ESQUIRE
  (ARGUED)
JOSEPH A. TATE, ESQUIRE
CHRISTINE C. LEVIN, ESQUIRE
GEORGE G. GORDON, ESQUIRE
Dechert, Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103

SHELDON M. FINKELSTEIN,
 ESQUIRE
SHIRLEY B. WHITENACK, ESQUIRE
HANNOCH WEISMAN, ESQUIRE
A Professional Corporation
4 Becker Farm Road
Roseland, NJ 07068

Attorneys for Appellee
GAF Corporation

STUART M. KURITSKY, ESQUIRE
 (ARGUED)
Bursik, Kuritsky & Giasullo
443 Northfield Avenue
West Orange, NJ 07052

Attorneys for Appellees
Arzee Supply Corp.,
Alvin Roth and Cary Roth

STEVEN M. RICHMAN, ESQUIRE
 (ARGUED)
PAUL J. FERDENZI, ESQUIRE
Gallagher, Briody & Butler
212 Carnegie Center, Suite 402
Princeton, NJ 08540

Attorneys for Appellee
Wood Fiber Industries, Inc.

STEPHEN F. BAN, ESQUIRE
 (ARGUED)
Springer, Bush & Perry
A Professional Corporation
Two Gateway Center, 15th Floor
Pittsburgh, PA 15222

DAVID K. DeLONGE, ESQUIRE
Schumann, Hanlon, Doherty,
 McCrossin & Paolino
30 Montgomery Street
P.O. Box 2029
Jersey City, NJ 07302

Attorneys for Appellee
Servistar Corporation

JOEL N. KREIZMAN, ESQUIRE
 (ARGUED)
Evans, Osborne, Kreizman and
 Bonney
180 White Road, Suite B 101
Little Silver, NJ 07739

Attorneys for Standard Roofing, Inc.,
William Higginson, The Estate of
Robert Higginson and
Joseph Licciardello

OPINION OF THE COURT

TABLE OF CONTENTS

PAGE

I. FACTS AND PROCEDURAL HISTORY                8

 A. The Parties                                8

 B. Rossi at Standard; Rossi Forms His
    Own Company                                10

 C. The Roofing and Siding Industry in Northern
    New Jersey; Price Discounting and
    Market Shares                              12

 D. Rossi's Damage Claims                      14

 E. Procedural History                         15

II. SECTION 1 OF THE SHERMAN ANTITRUST ACT     16

 A. Characterizing a Group Boycott; Per  se Versus
    the Rule of Reason                         17

 B. Concerted Action                           23

  1. Section 1 of the Sherman Antitrust Act --
     Proving the Conspiracy                    23

  2. Rossi's Evidence of Concerted Action      27

   a. Standard (Robert Higginson,
      William Higginson, and Joseph Licciardello)
      and Arzee (Al Roth and Cary Roth)        27

4

  b. GAF                                               37

   (1) Matsushita Implausibility           37

   (2) Circumstantial Evidence Against GAF    44

    (a) Distributors' Complaints and GAF's Response
                                              45

    (b) Actions in Contravention of GAF
       Corporate Policy                   46

    (c) Monitoring and Enforcement Activities   47

    (d) Pretextual Excuses                50

    (e) Conclusion                        51

   c. Servistar                              53

   d. Wood Fiber                           58

III. PROXIMATE CAUSE AND ANTITRUST INJURY    60

IV. STATE LAW TORTIOUS INTERFERENCE
    WITH CONTRACTUAL AND PROSPECTIVE
    CONTRACTUAL RELATIONS                69

V. CONCLUSION                             70

BECKER, Chief Judge.*

This appeal from the grant of summary judgment in favor of antitrust defendants presents a familiar pattern. A dealer irritates his competitors and their principal supplier through his aggressive price discounting practices. The other dealers complain to the supplier, who, to placate the aggrieved dealers, agrees not to sell any product to the dealer. The "boycotted" dealer then brings a Sherman Act suit, 15 U.S.C. S 1 et seq., in federal court. The alleged conspiracy involves a number of the plaintiff's competitors, and the refusal to deal is said to have become a group boycott, which can be a horizontal antitrust violation with per se antitrust implications; the supplier, notwithstanding its vertical relation to the plaintiff, is said to have become a co-conspirator.

The present case arose out of the rough and tumble roofing and siding materials distribution business in northern New Jersey, where several favored roofing and

_____

* Honorable Edward R. Becker, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on February 1, 1998.

5

siding distributors were concerned that the entrance of a new price cutting competitor could destabilize the market and substantially cut into their profit margins. The principal players in this drama are plaintiffs Joseph Rossi, and his two successive roofing and siding distribution businesses, Rossi Florence Corp. ("Rossi Florence"), and Rossi Roofing, Inc. ("Rossi Roofing"); defendants Standard Roofing, Inc., ("Standard") and Arzee Supply Corporation ("Arzee"), two of Rossi's chief competitors, and several of their key officers; and defendant GAF Corporation ("GAF"), the manufacturer that supplied the most important product in the market. Minor roles were played by defendants Wood Fiber Industries, Inc. ("Wood Fiber"), another roofing and siding manufacturer, and Servistar Corp. ("Servistar"), a national purchasing cooperative and reseller of roofing and siding products.

Following discovery, the district court granted summary judgment for all defendants on the ground that plaintiffs had failed to adduce sufficient evidence to meet the demanding standard of proof in the antitrust context established by the Supreme Court's jurisprudence. The court also relied on plaintiffs' alleged failure to demonstrate causation and damages. While we agree with the district court that Rossi cannot survive summary judgment as to Servistar and Wood Fiber, we believe that the record is sufficient to enable Rossi to survive summary judgment on the antitrust claims as to Standard, Arzee, the individual defendants associated with those firms, and GAF.

The Supreme Court's jurisprudence in the area of concerted refusals to deal teaches that not every situation in which a distributor is cut off at the behest of his competitors constitutes a group boycott entitled to per se treatment. Otherwise, legitimate efforts by manufacturers to impose reasonable rules limiting intra-brand competition would be outlawed and the beneficial effects such actions have on inter-brand competition would be lost. Moreover, the distinction between vertical and horizontal restraints would blur. These concerns, however, are not implicated here, in view of both the price-related orientation of the alleged offending conduct of the key defendants and the sheer scope and draconian modus operandi of the alleged conspiracy.

6

The jurisprudence also renders it difficult for an antitrust plaintiff to prove that the manufacturer and distributors conspired, typically because it is difficult for the plaintiff to demonstrate that what the manufacturer or supplier did was inconsistent with independent action or that the claimed conspiracy makes economic sense. In this case, however, at least at the summary judgment stage, that burden is surmounted by the presence of certain direct evidence of conspiracy as well as: (1) evidence that GAF acted against its consistent policy (and hence ostensibly against its own interest) in refusing to sell (and seeing to it that others did not sell) GAF products to Rossi; (2) evidence of pretext in connection with GAF 's efforts to explain away the foregoing; (3) evidence that the major suppliers had sufficient leverage over GAF to induce it to so act; and (4) the quite graphic and extensive nature of the statements and actions of various defendants directed towards eliminating Rossi as a price-cutting competitor who passed secret rebates onto his customers and thereby threatened to de-stabilize the market. We also discern genuine issues of material fact on causation and damages, and this too precludes summary judgment on the antitrust claims against the key defendants.

Although the district court's order granting summary judgment on the antitrust claims regarding GAF, Standard, Arzee, and their corporate officers must be reversed, it must be affirmed as to Servistar and Wood Fiber, since Rossi has failed to overcome his burden of showing that either Servistar's or Wood Fiber's actions tended to exclude the possibility of independent action on their part. More specifically, Rossi has failed to put forth any evidence of Servistar's motive to conspire; as we shall explain, Servistar's relationship to GAF was far different from that of the distributor defendants. Rossi has also failed to show that the other defendants had any leverage over Servistar with which they could have coerced it to join the conspiracy. With respect to Wood Fiber, the only evidence Rossi has been able to adduce is that Wood Fiber may, on one or two occasions, have responded to pressure and threats from Standard and Arzee by not selling to Rossi, and hence this record is insufficient to satisfy the

7

standards for proving concerted action as delineated by the Supreme Court.

Rossi also pressed a tortious interference claim under New Jersey state law. The district court granted summary judgment for all defendants on this claim without any discussion. This aspect of the judgment must be set aside because it violates our rule requiring that district courts accompany grants of summary judgment with an explanation sufficient to permit the parties and this court to understand the legal basis for the court's order. See Vadino v. A. Valey Eng'rs, 903 F.2d 253, 257-60 (3d Cir. 1990).

I. FACTS AND PROCEDURAL HISTORY

The following background facts, which describe the basic framework and background within which this case arises, are set forth in the light most favorable to the non-moving party as is required when considering a motion for summary judgment. The remainder of Rossi's evidence, most of which deals specifically with the existence vel non of concerted action by the defendants, will be detailed in S II.B.2, infra, after we have explained the appropriate legal standards.

A. The Parties

The plaintiffs, in addition to Joseph Rossi, are Rossi Florence and Rossi Roofing.1 Rossi has been in the roofing and siding distribution business in northern New Jersey

_____

1. Defendants contend that Joseph Rossi lacks standing as an individual to pursue this matter against them because his personal claims of injury are derivative of the claims of Rossi Florence and Rossi Roofing. The district court did not reach that issue because it found that no antitrust violation existed at all. See Rossi v. Standard Roofing, Inc., 958 F. Supp.
976, 991 n.11 (D.N.J. 1997). Since we are reversing the district court's grant of summary judgment in favor of several of the defendants and remanding this case for further proceedings, we will also remand the standing issue so that the district court can consider it in the first instance. Because we are not then differentiating between plaintiffs for the purposes of this appeal, we will assume that all three plaintiffs have standing, and will generally use the term "Rossi" to refer to them all.

since 1972. Rossi Florence and Rossi Roofing were roofing and siding distribution companies formed by Rossi at the end of 1988 and the beginning of 1989. Both are now out of business. This suit was brought against a number of Rossi's competitors (as well as several individuals associated with them), several roofing and siding manufacturers, and one national purchasing cooperative. Several of the original defendants, Allied Roofing, Inc. ("Allied"), Nailite Corp. ("Nailite"), Certainteed Corp. ("Certainteed"), and Wolverine Technologies Corp. ("Wolverine") have settled with Rossi and were dismissed from the case. The remaining defendants are: Standard, Arzee, GAF, Wood Fiber, Servistar, the estate of Robert Higginson (hereinafter "Robert Higginson"), William Higginson, Joseph Licciardello, Alvin Roth, and Cary Roth.

Standard and Arzee are distributors of roofing and siding products in northern New Jersey. Like Rossi Roofing, they purchase products from manufacturers and resell them to contractors and applicators in large volume. Standard is headquartered in Tinton Falls, New Jersey and has seven branch locations, including five in New Jersey, one in Pennsylvania, and one in Connecticut. Robert Higginson was the founder and chairman of Standard. William Higginson, Robert's son, is a shareholder and the current president of Standard. Arzee is a family-owned distributor with one of its branches located adjacent to Standard in Cedar Knolls. Defendant Alvin Roth is a shareholder and the president of Arzee, and defendant Cary Roth is Alvin's son and one of Arzee's branch managers.

GAF and Wood Fiber manufacture and supply roofing products to distributors like Rossi Roofing, Standard, and Arzee. GAF and Wood Fiber are two of the 37 roofing product manufacturers that serve the northern New Jersey market. GAF manufactures and sells its roofing material ("GAF product") to most, but not all, of the distributors located in northern New Jersey. GAF sold to Standard, Arzee, and Allied, but refused to sell to Rossi. Joseph Licciardello was an employee of GAF, who quit his job and replaced Rossi as vice president of Standard after Rossi was fired.[2] Wood Fiber competes with GAF in the northern New

_____

2. Section I.B, infra, provides further information about Rossi's career at Standard.

9

Jersey market, manufacturing and selling Structodek FS, a product used principally in commercial roofing applications.

Defendant Servistar is a member-owned, national purchasing cooperative that operates hardware distribution centers nationwide. Servistar has over 4000 members at the retail level and deals primarily in paint, hardware, plumbing and electrical supplies, housewares, lawn and garden equipment, power tools, and lumber. Roofing products account for only 2% of Servistar's total purchases on behalf of its members, which were just under $1 billion in 1990. Servistar does not warehouse roofing supplies, but rather operates on a "drop shipment" basis, meaning that members place their orders through Servistar (which affords them a discount based on Servistar's status as a national volume purchaser), and the selected roofing manufacturer then supplies the product directly to the member. Servistar pays the manufacturer and later collects from the member.

B. Rossi at Standard; Rossi Forms His Own Company

From 1972 to 1988, Rossi worked for defendant Standard as the manager of its Cedar Knolls, New Jersey branch, selling roofing and siding materials. In 1980, Rossi was promoted to vice president, rewarded with stock in the company, and told that he would eventually become a co-owner of the business. Eight years later, however, in September 1988, Standard fired Rossi. The parties dispute the reasons for Rossi's discharge. Rossi alleges that Standard fired him because he refused to participate in a conspiracy with defendant Arzee to fix prices, discussed infra at S II.B.2.a. Standard claims that it fired Rossi for a combination of reasons including his deteriorating work performance, his failure to control expenses, the Cedar Knolls branch's excessively high payroll expenses under his management, his large personal expense account, his failure to arrive at work until late morning, his concentration on outside business ventures to the detriment of Standard, and, ultimately, his failure to achieve branch profits commensurate with branch sales.

At all events, by the time he was fired, Rossi had developed a reputation within the industry for extremely

10

competitive pricing, excellent service, and reliability. While at Standard, Rossi had refined an aggressive marketing strategy that stressed high volume sales at low prices. This strategy, as one might imagine, angered Rossi's competitors and even concerned some of his suppliers, which were sensitive to their distributors concerns about pricing.

After his termination, Rossi decided to use his connections within the industry to open his own roofing and siding distributorship that would serve northern New Jersey in direct competition with Standard and Arzee. Rossi's first attempt, in late 1988, was Rossi Florence, a joint venture with Richard Droesch ("Droesch"), president of Florence Corp. ("Florence"), a roofing, siding, and window distributor in Long Island, New York. Rossi and Droesch planned to operate their new business out of a warehouse Rossi owned at 8 Frederick Place, located immediately adjacent to Standard's Cedar Knolls/Morristown branch and just down the street from Arzee's Morristown branch. Rossi and Droesch made substantial preparations for their venture during the fall of 1988. Droesch (together with one of his employees) invested $100,000 in Rossi Florence, and Rossi Florence obtained a $900,000 bank line of credit secured by the principals' personal guarantees. By mid-January 1989, however, Droesch decided to pull out of Rossi Florence, and Rossi refunded his investment. Droesch felt that because of pressure from Standard, Arzee, and others, the new company would be unable to get the products it needed to successfully compete in the market. In addition, Alvin Roth, president of Arzee, threatened Droesch that if he continued in business with Rossi in New Jersey, Arzee would open up a branch in Long Island to compete directly with Droesch's Florence distributorship.

Thereafter, in February 1989, Rossi incorporated Rossi Roofing, continuing his efforts to break into the roofing and siding distribution business in northern New Jersey. Rossi Roofing obtained another $900,000 bank line of credit, personally guaranteed by Rossi and his wife. The company, which opened for business on March 20, 1989, closed in less than a year, after experiencing great difficulty in obtaining product lines and weathering the brunt of a major downturn in the New Jersey housing industry. In

11

January 1990, unable to run Rossi Roofing profitably, Rossi sold the company's assets to American Builders and Contractors, Inc. ("ABC"), a national roofing and siding distributor.

C. The Roofing and Siding Industry in Northern New Jersey; Price Discounting and Market Shares

During the relevant time period, the northern New Jersey market included thirty-nine roofing distributors with more than fifty-seven locations. Eleven residential roofing manufacturers, nine commercial roofing manufacturers, and seventeen vinyl siding manufacturers operated in the region. It is undisputed that this roofing and siding marketplace was highly competitive, and that roofing and siding contractors constantly price-shopped, pitting distributor against distributor in order to obtain the best possible deal.

GAF, which served this region, offered certain favored distributors secret off-invoice, volume and non-volume discounts or "rebates" in the form of periodic credits against purchases. Standard, Arzee, and former defendant Allied purportedly all received such discounts from GAF. The amount of these discounts was kept highly confidential because the favored distributors feared that if other distributors found out, they might complain to GAF and ultimately destabilize prices in the market. As GAF district sales manager Elmer "Bud" Krusa put it, "the less people that know about it, the less chance you have of getting it -- dropping the entire market price." Rossi contends that while he was employed at Standard, he would pass these discounts on to his customers in an effort to increase his market share, whereas his competitors typically pocketed the rebate.

GAF and Wood Fiber are the only two manufacturers remaining as litigants in this case. According to GAF 's own estimates, it supplied a large percentage of the New Jersey shingle market (38% for all shingles and 71% for laminate shingles). GAF was Standard's primary supplier of roofing products in the 1980's, and Standard was GAF 's biggest customer in New Jersey and one of its top five customers in the entire country. Standard bought $7.7 million of GAF

12

product in 1989 (or 32% of GAF 's total sales in New Jersey that year), substantially more than any other GAF customer in New Jersey.

Arzee and former defendant Allied also purchased GAF product, but in markedly smaller quantities. Arzee, for example, featured Tamko and Owens Corning Roofing, rather than GAF product, and only purchased $919,747 of GAF product in 1989 (or 4% of GAF's total sales in New Jersey in 1989). Together, however, Standard, Arzee, and Allied (which bought $2.1 million of GAF product in 1989) purchased $10.7 million of the $24.1 million of GAF product sold in New Jersey (or 44% of GAF 's total sales in New Jersey in 1989).3 Rossi contends that, notwithstanding the large number of other manufacturers offering product in the area, GAF product was critical for a distributor to successfully compete in Northern New Jersey, as evidenced by GAF's large market share and also the fact that it was the most desirable and popular roofing material available. This in turn stems in part from several facts: GAF product was well-known by both homeowners and contractors; GAF guaranteed its product; and importantly, GAF product had already been selected for many of the existing townhouse projects in northern New Jersey in 1989 and 1990, making it impossible for the builders to switch brands mid-stream.

The evidence in the record regarding Wood Fiber's market position in 1989-90 is not as clearly defined as that of GAF. Wood Fiber manufactures Structodek FS, a commercial roofing product used primarily in commercial applications for certain modified bitumen roofs. Commercial work comprised no more than a third of Rossi Roofing's business; the remaining two-thirds consisted of residential roofing. We do not know from the record how much product

_____

3. 1989 sales of GAF product in the northern New Jersey market (rounded to the nearest $100,000) were:

| Company | Amount | % of Total Sales |
| --- | --- | --- |
| Standard | $ 7,700,000 | 32.0% |
| Allied | $ 2,100,000 | 8.7% |
| Arzee | $   900,000 | 3.8% |
| Total | $10,700,000 | 44.5% |

Wood Fiber sold in the northern New Jersey market; nor do we know what percentage of Wood Fiber's sales was purchased by Standard or Arzee (or Allied); nor is there any evidence that Wood Fiber had an off-invoice rebate program favoring certain distributors similar to GAF's. This is not surprising because Wood Fiber's involvement in this case stems largely from two isolated episodes, one in which a Wood Fiber representative complained of "pressure" not to sell to Rossi Roofing, and another in which Wood Fiber refused to supply product to Rossi after having accepted an order. See infra S II.B.2.d.

D. Rossi's Damage Claims

Rossi submits that because of his inability to purchase "GAF and other essential products, Rossi Roofing could not succeed." Unable to sustain the business any longer, on January 8, 1990, Rossi entered into an asset purchase agreement with ABC, which leased Rossi's 8 East Frederick Place property and opened a branch where Rossi Roofing once stood. Most employees, including Rossi as the branch manager, continued to work for ABC. According to Rossi, ABC (which was able to get GAF and other products) did very well. In 1990, it achieved over $5.5 million in sales, and by 1993, sales had increased to $11 million.[4] In 1993, ABC fired Rossi, closed the Morristown branch, and transferred operations to Randolph, New Jersey. Rossi then entered into a similar agreement with Allied, which opened up a location on Rossi's property and hired him to manage it.

Rossi contends that he suffered substantial damages when Rossi Florence and Rossi Roofing, unable to get GAF and other important products, failed. In support, Rossi offers the testimony of several of his former customers during his tenure at Standard, who stated that they would

_____

4. There is little evidence as to what the net profits (or losses) of the ABC
branch were. Arzee contends, based upon some nebulous testimony in the record, that the ABC branch run by Rossi suffered losses in each of its four years of operation, app. at 4253-56, and that the Morristown branch of ABC was a failure, generating only $5 million in revenues in 1990, $1.7 million less than Rossi's own break-evenfigure for Rossi Roofing. App. at 4309-10.

14

have done business with Rossi Roofing if it had had the necessary product lines. Thus, in Rossi's submission, if the manufacturers had sold to him the same products that they ultimately sold to ABC (and later Allied), Rossi Roofing would have succeeded, and "over time, Rossi would have had his company open up new branches, as Standard, Arzee and Allied have done. The lost profits to Rossi Florence, and to Rossi Roofing, have been over $7 million at a minimum." In addition, Rossi claims to have suffered additional, non-duplicative damages of over $1 million from payments he made on behalf of Rossi Florence and Rossi Roofing, including payments made on his personal guarantees of Rossi Roofing's debts.

E. Procedural History

Rossi's action in the district court alleged, inter alia, a group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. S 1, and Section 3 of the New Jersey Antitrust Act, as well as tortious interference with plaintiffs' contractual and prospective contractual relations.5 After extensive discovery and submissions in support of and opposition to the motions, the district court granted defendants' motions for summary judgment, finding insufficient evidence of concerted action, causation, and damages. Rossi has appealed not only that judgment but also a discovery ruling -- the district court's order denying a motion to compel defendant GAF to provide additional factual detail about the subject matter of GAF's counsel's handwritten notes of three telephone conversations with GAF employees.

The district court had subject matter jurisdiction pursuant to 28 U.S.C. SS 1337 and 1367, as well as 15 U.S.C. S 15. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291.

_____

5. State law claims for breach of contract, conversion, fraud, and negligent misrepresentation, arising out of Rossi's contractual relationships with Standard, were dismissed without prejudice and are not under review here.

15

## II. SECTION 1 OF THE SHERMAN ANTITRUST ACT

Under the literal dictates of S 1 of the Sherman Act "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. 1 (emphasis supplied). The Supreme Court has interpreted this provision to prohibit only unreasonable restraints. See Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988). To determine whether a restraint is unreasonable, courts apply one of two modes of analysis, depending upon the nature of the concerted action at issue. Agreements are either analyzed through "a case-by-case application of the so-called rule of reason," whereby the fact finder "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition," id. (internal quotations omitted), or the court applies the per se standard, which dispenses with the need for case-by-case analysis.[6] See id. Under the per se standard, conduct that is "manifestly anticompetitive" or "would always or almost always tend to restrict competition," id. (internal citations omitted), is conclusively presumed to unreasonably restrain competition "without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use." Northern Pac. Ry. v. United States, 356 U.S. 1, 5 (1958). This is because "of [its] pernicious effect on competition and lack of any redeeming virtue." Northern Pac. Ry., 356 U.S. at 5. Thus, the first issue we must consider is whether the conduct alleged here warrants per se or the more lenient rule of reason treatment, because that determination will dramatically affect the quantum of proof Rossi must offer to sustain his claim.

_____

6. We have also recently discussed a third standard that falls somewhere between the rule of reason and per se standards. In our jurisprudence, we refer to this middle ground as an abbreviated or"quick look" rule of reason analysis. See Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 n.9 (3d Cir. 1996) (citing United States v. Brown Univ., 5 F.3d 658, 669 (3d Cir. 1993)). This "quick look" analysis applies "where per se condemnation is inappropriate, but where a full-blown industry analysis is not required to demonstrate the anticompetitive character of an inherently suspect restraint." Id.

16

A. Characterizing a Group Boycott; Per se Versus the Rule
   of Reason

Rossi, relying on such cases as United States v. General
Motors Corp., 384 U.S. 127 (1966), Big Apple BMW, Inc. v.
BMW of N. Am., Inc., 974 F.2d 1358, 1376 (3d Cir. 1992),
Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 473 (3d
Cir. 1985); Malley-Duff, 734 F.2d at 140, and Edward J.
Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 114 (3d
Cir. 1980), alleges that the defendants engaged in a classic
horizontal group boycott that qualifies as a per se violation.
Rossi submits that several of his fellow distributor-
competitors (i.e. Standard, Arzee, and Allied), as well as
their principal manufacturer/supplier(s), agreed to boycott
Rossi Florence and Rossi Roofing and frustrate Rossi's
attempts to obtain the products he needed to successfully
compete against them.

Defendants respond that Rossi's theory does not
comprise a per se antitrust claim because it is a vertical
conspiracy in which there has been no allegation of resale
price fixing. We agree with defendants that if this were
simply a vertical conspiracy, between one horizontal
competitor and one supplier or manufacturer, we would
analyze it under the rule of reason unless there were some
evidence of price fixing. See Business Elecs., 485 U.S. at
735-36 (analyzing an alleged agreement between one
supplier and one horizontal distributor as a vertical non-
price-fixing conspiracy under the rule of reason); Tunis
Brothers, 763 F.2d at 1497, 1502 (same); cf. Continental
T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 37, 59 (1977)
(concluding that franchise agreements that bar retailers
from selling franchised products from locations other than
those specified are analyzed under the rule of reason).7
Unlike the cases cited above, however, here there are a
number of horizontal competitors involved. Thus, this case
more closely resembles the horizontal nature of United

_____

7. In Business Elecs., the Supreme Court indicated that the rationale
behind applying the rule of reason to vertical non-price restraints is
that
such restraints have the potential to promote inter-brand competition,
the "primary concern of the antitrust laws," over intra-brand
competition. See 485 U.S. at 724-25 (citations omitted).

States v. General Motors Corp., 384 U.S. 127 (1966), a case that the Supreme Court treated as a group boycott with per se implications.

In General Motors, the Supreme Court found a group boycott where a group of automobile dealers had joined together to force their manufacturer, General Motors, to assist them in ending the practice of some dealers that were reselling their automobiles to discounters. See id. at 143-44, 147. Other cases fit this mold as well. See, e.g., Big Apple BMW, 974 F.2d at 1376 (analyzing an alleged agreement among supplier BMW North America and several of its dealers to prevent a potential price-cutting competitor from receiving a franchise as a horizontal group boycott); Sweeney, 637 F.2d at 114 (holding that when a manufacturer terminates a distributor's supply pursuant to an agreement with several distributors, these actions make out a horizontal S 1 claim); cf. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212-13 (1959) (applying a similar horizontal analysis under S 2 of the Sherman Act where manufacturers and distributors had conspired among themselves and with a major retailer to deprive another retailer access to product lines).

The common principle we glean from these cases is that a conspiracy is horizontal in nature when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers to eliminate their price-cutting competition by cutting his access to supplies. From this perspective, Rossi's asserted conspiracy is indistinguishable from those put forth in General Motors, Klor's, Big Apple BMW and Sweeney -- namely, "joint action to eliminate [a] discounter[ ] from participation in the market," General Motors, 384 U.S. at 144-- and thus, the defendants' characterization of the conspiracy Rossi alleges as vertical, and not horizontal, cannot withstand scrutiny.

This conclusion, however, leaves us with the second (and ultimately more difficult) question whether this horizontal agreement, which Rossi labels a "group boycott," qualifies as a per se violation. Traditionally, such agreements have received such per se treatment. See Malley-Duff & Assocs. v. Crown Life Insur. Co., 734 F.2d 133, 140 (3d Cir. 1984). Indeed, in all of the horizontal "group boycott" cases listed

18

above, the court adopted the per se approach. See, e.g., General Motors Corp., 384 U.S. at 143-44, 147; Klor's, 359 U.S. at 212-13; Big Apple BMW, 974 F.2d at 1376; Sweeney, 637 F.2d at 114. More recently, however, the Supreme Court has reminded us that it is not a simple exercise to determine what conduct falls within the "forbidden category" of a per se group boycott. See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 294 (1985) (" `[T]here is more confusion about the scope and operation of the per se rule against group boycotts than in reference to any other aspect of the per se doctrine.' ") (quoting L. Sullivan, Law of Antitrust 229-30 (1977)); FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 458-59 (1986). Under the more recent jurisprudence, it is clear that assigning the label "group boycott" to a concerted refusal to deal with a distributor does not have a talismanic effect, automatically bringing the case under the per se rubric. Instead, the Supreme Court has directed us to carefully scrutinize the nature of the asserted refusals to deal to determine whether it fits within the per se " `boycott' pigeonhole." Indiana Fed'n of Dentists, 476 U.S. at 458.

In Northwest Wholesale Stationers, the Supreme Court attempted to explain what kinds of boycotts qualify for the per se approach and what kinds do not. The Court emphasized that the per se approach was appropriate when the allegations were of "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." 472 U.S. at 294 (internal quotes omitted). The Court also noted that per se boycott cases usually contain three elements: "denial of something a competitor needs to compete effectively, defendants with a dominant position in the relevant market, and the absence of any plausible contention that the challenged behavior would `enhance overall efficiency and make markets more competitive.' " P. Areeda & H. Hovenkamp, Antitrust Law P 1510È (Supp. 1997) (quoting and interpreting Northwest Wholesale Stationers, 472 U.S. at 294-95). Finally, the Court instructed that although "a concerted refusal to deal need not necessarily possess all of these traits to merit per se

treatment . . . [a] plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive."8 Northwest Wholesale Stationers, 472 U.S. at 295, 298.

Applying these precepts to the "boycott" at issue in Northwest Wholesale Stationers, the Court determined that it was "not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects." Id. at 295. In that case, a retail office supply store had sued a nonprofit cooperative buying association claiming that its expulsion from the cooperative was per se illegal. The expulsion --without explanation, notice, or hearing -- hurt

_____

8. The Courts of Appeals have differed in their application of this language. The Seventh Circuit has held that "once control over an important resource appears, no justification for a refusal to deal can be considered." Areeda & Hovenkamp, Antitrust Law P 1510È (interpreting Fishman v. Wirtz, 807 F.2d 520, 541 (7th Cir. 1986) (holding that a concerted refusal to deal is illegal per se if the "defendants have either market power or exclusive access to an element essential to effective competition.") (internal quotes omitted)). The Eighth and Ninth Circuits have focused on the number of horizontal players in the alleged conspiracy and have found no per se rule against boycotts in situations where the conspirators included only a single supplier and a single retailer in competition with the plaintiff. See id. (discussing Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 591 (8th Cir. 1987) ("there must be some collusion between competitors on the same market level," for otherwise the "net economic impact of refusals to deal" is not "immediately obvious") and Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 734 (9th Cir. 1987)). The implication of these holdings would seem to be that the result differs as the number of parties to the conspiracy grows. This Court has tended to follow the Eighth and Ninth Circuits and has seemingly been more willing than some others, see, e.g., K.M.B. Warehouse Dists., Inc. v. Walker Manuf. Co., 61 F.3d 123, 127 (2d Cir. 1995) (viewing an alleged agreement among a vertical manufacturer and three horizontal distributors as a vertical non-price-fixing conspiracy subject to the rule of reason, not per se, analysis), to find an horizontal per se violation when a small number of dealers have prevailed upon a manufacturer or supplier to cut off a price discounter. See, e.g., Big Apple BMW, 974 F.2d at 1376; Malley-Duff, 734 F.2d at 140, and Sweeney, 637 F.2d at 114.

the plaintiff by effectively raising the wholesale price of supplies and eliminating certain favorable warehousing options made available to members of the defendant. Examining this type of restraint, the Court held that "[t]he act of expulsion from a wholesale cooperative does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect." Id. at 296 (citations omitted). Rather, the Court noted that cooperatives must "establish and enforce reasonable [membership] rules in order to function effectively." Id. Therefore, the rules that the plaintiff allegedly violated (it allegedly failed to disclose to the cooperative membership of a change in its ownership) might have been necessary for the cooperative to monitor its members' creditworthiness. Without a showing that "the cooperative possesse[d] market power or exclusive access to an element essential to effective competition," the Court held that expulsion based upon violation of the disclosure rules was not "likely to result in predominantly anticompetitive effects." Id.

Similarly, in Indiana Fed'n of Dentists, the Court refused to extend per se group boycott status to a situation in which a professional association collectively refused to cooperate with insurers' requests for x-rays. The Court refused to expand the category of cases classified as per se group boycotts to situations involving professional associations or situations where "the economic impact of certain practices is not immediately obvious." 476 U.S. at 459. While the collective refusal to cooperate with insurers "resemble[d] practices that have been labeled `group boycotts,' " the Court refused to hold that the economic impact of this agreement was immediately obvious. Id. at 458.

Here, in contrast to Indiana Fed'n of Dentists and Northwest Wholesale Stationers, the defendants are not members of a professional association, and the economic impact of their actions -- driving a price-cutting competitor out of business -- is clear. Applying the precepts laid out in Northwest Wholesale Stationers, we believe that the Rossi boycott falls within the description of "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers

21

to deny relationships the competitors need in the competitive struggle." 472 U.S. at 294 (internal quotes omitted). As will be discussed more fully below, see infra S II.B.2.b(1), Rossi has adduced evidence that GAF product was, if not unique, then at least necessary for him to compete in the marketplace. Further, the gravamen of his complaint fits snugly within the Court's Northwest Wholesale Stationers description of per se concerted refusals to deal -- namely, Standard and Arzee (and perhaps other horizontal competitors like Allied) conspired with manufacturers like GAF and suppliers like Servistar to deny Rossi access to GAF product as well as to coerce other suppliers not to sell any products to him. Importantly, all of this activity was done against the backdrop of Standard's and Arzee's dissatisfaction with Rossi's price-cutting proclivities, and thus an inference can be drawn that the conspiracy was at least partially conceived as a price restraint.

For these reasons, we find it implausible that the alleged behavior by the defendants would "enhance overall efficiency and make markets more competitive," Northwest Wholesale Stationers, 472 U.S. at 294, and therefore, taking into account the Court's most recent guidance, we conclude that Rossi's allegations should be analyzed using the per se framework.

Our conclusion that Rossi's allegations constitute a per se violation of S 1 simplifies our analysis here. In the usual rule of reason case, to establish a violation ofS 1, plaintiffs must prove:

> (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

Tunis Bros. Co., Inc. v. Ford Motor Co., 763 F.2d 1482, 1489 (3d Cir. 1985) (citations omitted), vacated on other grounds, Ford Motor Co. v. Tunis Brothers Co. Inc., 475 U.S. 1105

22

(1986). Here, because per se analysis applies, prongs two and three are conclusively presumed satisfied and need not be addressed. Accordingly, to prevail on summary judgment, Rossi need only show the existence of a genuine issue of material fact regarding concerted action and proximate causation. We will address these in turn.

B. Concerted Action

1. Section 1 of the Sherman Antitrust Act-- Proving the Conspiracy

The presence of concerted action or an agreement is an essential element of a S 1 claim. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984) ("[U]nity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement" must exist to trigger section 1 liability.) (internal quotes omitted); Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 999-1000 (1994) (noting that the existence of concerted action is one of the important distinguishing features between a S 1 claim of conspiracy and a S 2 claim of monopolization). Unilateral activity, no matter what its motivation, cannot give rise to aS 1 violation, see Sweeney, 637 F.2d at 110-11, because a manufacturer "has the right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984). A plaintiff may utilize either direct or circumstantial evidence in order to make out the element of concerted action. While direct evidence, the proverbial "smoking-gun," is generally the most compelling means by which a plaintiff can make out his or her claim, it is also frequently difficult for antitrust plaintiffs to come by. Thus, plaintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy. See Alvord-Polk, 37 F.3d at 1000 (citing Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537 (1954); Sweeney, 637 F.2d at 111).

While the traditional summary judgment standard applies with equal force in antitrust cases,9 when the
_____

9. A district court's grant of summary judgment is subject to plenary review. See Knabe v. Boury Corp., 114 F.3d 407, 410 n.4 (3d Cir. 1997);

23

plaintiff relies solely on circumstantial evidence to prove concerted action, this analysis is modified in accordance with the leading antitrust cases dealing with this subject, Monsanto and Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and their progeny. In Matsushita, the Supreme Court explained the limitation courts must apply to permissible inferences when deciding a summary judgment motion in an antitrust conspiracy case: "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588 (citing Monsanto, 465 U.S. at 764). Rather, to survive a motion for summary judgment, "a plaintiff seeking damages for a violation of S 1 must present evidence `that tends to exclude the possibility' that the alleged conspirators acted independently," id., "direct or circumstantial evidence that reasonably tends to prove that

_____

Public Interest Research of New Jersey v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 71 (3d Cir. 1990). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

As in this case, when the nonmoving party will bear the burden of proof at trial, that party must adduce evidence "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating the sufficiency of the evidence, facts and inferences must be viewed in the light most favorable to the party opposing summary judgment. See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). That being said, however, when the moving party has pointed to material facts tending to show there is no genuine issue for trial, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.' " Matsushita, 475 U.S. at 586-87 (citations omitted).

24

[the alleged conspirators] `had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " Monsanto, 465 U.S. at 764 (quoting Sweeney, 637 F.2d at 111).

The Supreme Court's concerns about permitting the inference of a conspiracy from ambiguous circumstantial evidence in the antitrust context stem from its conclusion that mistakes by an overzealous judiciary would be "especially costly . . . chill[ing] the very conduct the antitrust laws are designed to protect." Matsushita, 475 U.S. at 594; Monsanto, 465 U.S. at 763; Big Apple BMW, 974 F.2d at 1363 ("Care must be taken to ensure that inferences of unlawful activity drawn from ambiguous evidence do not infringe upon defendant's freedom, so long as it acts independently, to refuse to deal.") (citing United States v. Colgate & Co., 250 U.S. 300 (1919)). For this reason, the plausibility of an antitrust plaintiff's claim is important. "[I]f the factual context renders [the plaintiff's] claim implausible -- if the claim is one that simply makes no economic sense -- [a plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." Matsushita, 475 U.S. at 587 (citations omitted). Relatedly, in evaluating whether a genuine issue for trial exists, the antitrust defendants' economic motive is highly relevant. "[I]f[the defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." Id. at 596. Moreover, even with a plausible motive to conspire, ambiguous conduct will not create a triable issue of fact with respect to the existence of a conspiracy. See id. at 597 n.21.

Under our jurisprudence, the Matsushita standard only applies when the plaintiff has failed to put forth direct evidence of conspiracy. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1233 (3d Cir. 1993). Thus, in direct evidence cases, the plaintiff need not adduce circumstantial evidence " `that tends to exclude the possibility' that the alleged conspirators acted independently," Matsushita, 475 U.S. at 588, and there need not be an inquiry into the plausibility of the

defendants' claim or the rationality of defendants' economic motives. See id. at 596-97. This is because when the plaintiff has put forth direct evidence of conspiracy, the fact finder is not required to make inferences to establish facts, and therefore the Supreme Court's concerns over the reasonableness of inferences in antitrust cases evaporate. See Petruzzi's, 998 F.2d at 1233.

Additionally, our jurisprudence does not require the summary judgment opponent to " `match, item for item, each piece of evidence proffered by the movant,' " but rather he or she must only exceed the " `mere scintilla' " standard. See Petruzzi's, 998 F.2d at 1230 (quoting Big Apple BMW, 974 F.2d at 1363). Accordingly, when examining the sufficiency of what the plaintiff has adduced, we are not to "tightly compartmentalize the evidence," but rather we must evaluate it as a whole to see if it supports an inference of concerted action. See id. at 1230.

In sum, Matsushita does not introduce a special burden on antitrust plaintiffs opposing summary judgment; it "demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision. If the plaintiffs theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted." Eastman Kodak, 504 U.S. at 468-69 (footnote omitted). Conversely, Matsushita does not mean that antitrust defendants are entitled to summary judgment merely by showing that there is a plausible explanation for their conduct; rather "the focus must remain on the evidence proffered by the plaintiff and whether that evidence `tends to exclude the possibility that [the defendants] were acting independently.' " Petruzzi's, 998 F.2d at 1232 (quoting Monsanto, 465 U.S. at 764). Thus, where the nonmoving party has put forth evidence that provides an inference of concerted action, the moving party "bears the burden of proving that drawing the inference of unlawful behavior is unreasonable." Id. at 1230.

Finally, while ambiguous conduct cannot create a triable issue of fact, when "the alleged conduct is `facially anticompetitive and exactly the harm the antitrust laws aim

26

to prevent,' no special care need be taken in assigning inferences to circumstantial evidence." Alvord–Polk, 37 F.3d at 1001 (quoting Eastman Kodak, 504 U.S. at 478).

With these standards in mind, we will address the evidence adduced by Rossi in support of his theory of conspiracy. Cognizant of our obligation to view the evidence as a whole and to resist the temptation to compartmentalize it, see Petruzzi's, 998 F.2d at 1230, we will nonetheless consider Rossi's allegations, defendant by defendant, to provide a logical structure to our analysis. We note in this regard that this court has been relatively hospitable to the efforts of plaintiffs to prove concerted action. See Alvord–Polk, 37 F.3d at 1010, 1013; Petruzzi's, 998 F.2d at 1247; Big Apple BMW, 974 F.2d at 1380, 1383; Arnold Pontiac–GMC, Inc. v. Budd Baer, Inc., 826 F.2d 1335, 1338–39 (3d Cir. 1987); Arnold Pontiac–GMC, Inc. v. General Motors Corp., 786 F.2d 564, 572–75 (3d Cir. 1986); Tunis Bros., 763 F.2d at 1489, 1502.

2. Rossi's Evidence of Concerted Action

      a. Standard (Robert Higginson, William Higginson, Joseph Licciardello) and Arzee (Al Roth and Cary Roth)10

We begin with Rossi's horizontal competitors, Standard and Arzee, against whom Rossi has the strongest evidence of motive to keep a price-cutting competitor with close ties to many customers from entering the market. Standard's and Arzee's (as well as the other defendants') first line of defense to Rossi's charges is that the conspiracy he alleges is implausible, and therefore under Matsushita, permitting an inference of antitrust conspiracy would have the effect of "chill[ing] the very conduct the antitrust laws are designed to protect." 475 U.S. at 594. According to the defendants, there was no rational economic reason for them to conspire,

_____

10. In our discussion of Standard, Robert Higginson, William Higginson, Joseph Licciardello, and also Arzee, Alvin Roth, and Cary Roth, we find no basis to separate the individual defendants from their respective corporate employers. Thus, for shorthand purposes, when we make future reference to "Standard" or "Arzee," (or the "Standard defendants" and the "Arzee defendants"), we refer to the individuals as well as the corporate entities with which they are related.

27

and thus they had no plausible motive to conspire to boycott Rossi.

They base their implausibility claim on the fact that the market was extremely price competitive and consisted of upwards of three dozen competing distributors. Under these conditions, defendants argue that they could not have charged above-market prices and stayed in business, and thus that they had nothing to fear from a price-cutter like Rossi. Moreover, they submit that there would be little to gain by excluding one more distributor from the market when there were at least three dozen firms in the market already. In defendants' view, any conspiracy to stabilize the market and reap enhanced profits would be doomed to failure (and is therefore presumably implausible) because, to succeed, it would have required an enormously complex and far-reaching undertaking, involving upwards of sixty participants (each selling different quantities of comparable, competing products) to stabilize prices at supra-competitive levels. Defendants maintain that, because there was virtually no likelihood that three (Standard, Arzee, and Allied) out of the almost forty competing distributors, and one or two (GAF and possibly Wood Fiber) out of thirty manufacturers could have sustained such a conspiracy, they had no rational motive to conspire, and the conspiracy is thus implausible.

The defendants compare this to the situation in Matsushita. There, the defendants were alleged to have entered into a twenty-plus-year conspiracy to fix prices in the electronics market below the market level in the hopes of establishing a monopoly and extracting monopoly profits in the undetermined future. See Matsushita, 475 U.S. at 588-90. The Court viewed this predatory pricing scheme as implausible because it would have required multiple defendants to endure tremendous up-front losses for the foreseeable future in the hopes that they could, at some point, recover these losses and make even greater profits once they had driven their competitors from the market and established a monopoly. See id. at 589-90. The Court, examining the electronics market as well as the length and ongoing failure of the alleged conspiracy, concluded that there was no evidence that the defendants could ever

28

recoup such losses, see id. at 594-95, and therefore, that the defendants had no motive to engage in the conspiracy. See id. at 595.

Standard's and Arzee's reliance on Matsushita in this case is misplaced for several reasons. As a threshold matter, Matsushita does not apply when there is direct evidence of conspiracy. See Petruzzi's, 998 F.2d at 1233. Here, Rossi has adduced direct evidence of concerted action between defendants Standard and Arzee in the form of a threat Rossi received in December of 1988. Joseph Licciardello, who had by that time left his job at GAF and was working in Rossi's old job as manager of the Standard branch at Cedar Knolls, told Rossi that Standard and Arzee would do whatever it took to put him out of business if he persisted with his plans to found Rossi Florence. In his deposition, Rossi testified:

> Q: Mr. Rossi, tell me specifically what anyone from Standard did to prevent Rossi Florence from going into business.
>
> * * *
>
> A: I guess it started when Joe Licciardello came over and threatened me that if I went into business that he and Arzee Supply would do anything they could, stop supplies, cut the prices, whatever they had to do they were going to do to keep me out of business. That's the way he put it.[11]

_____

11. Arzee argues that this statement is not admissible against it under Bourjaily v. United States, 483 U.S. 171 (1987). We conclude that it is. Under Fed. R. Evid. 801(d)(2)(E), "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not inadmissible hearsay as to that party. Under our jurisprudence, four requirements must be met before a statement can be admitted under this exception. "It must appear: (1) that a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." United States v. McGlory, 968 F.2d 309, 333 (3d Cir. 1992). The district court must find these requirements by a preponderance of the evidence. See Bourjaily, 483 U.S. at 175; McGlory, 968 F.2d at 333. The district court made no such finding here. It did not even address the

29

Licciardello's threat, viewed in a light most favorable to Rossi, indicates that two of his competitors had discussed and agreed to act jointly to prevent Rossi from competing with them in the roofing and siding business in northern New Jersey. Moreover, Licciardello's statement even details how the two companies planned to do it; they agreed to "stop supplies" anyway they could. Thus, we conclude that the Matsushita implausible conspiracy argument is not relevant to the allegations of conspiracy with respect to Standard and Arzee. However, even if, as in the case of GAF, there was no direct evidence of concerted action, the conspiracy Rossi alleges is not implausible. Indeed, as we will discuss below, with respect to Standard, Arzee, and GAF, the conspiracy makes perfect sense. See infra S II.B.2.b(1).

The direct evidence discussed above is enough to take the case against Standard and Arzee beyond the constraints of Matsushita (and thus permits us to avoid the questions whether the circumstantial evidence tends to exclude the possibility of independent action, whether the plaintiff 's claim is plausible, and whether the defendants' economic motives were rational). See supra at S II.B.1. However, it is not enough by itself to satisfy Rossi's burden in opposing summary judgment. On the other hand, Rossi has adduced a significant collection of other evidence, circumstantial in nature, in support of his position. We turn to that evidence now.

First, Rossi has adduced evidence of two meetings between Standard and Arzee employees which, when taken

_____

issue, concluding, as a matter of law, that no conspiracy existed. Thus, the question whether there is sufficient evidence to permit such a finding is subject to plenary review. See McGlory 968 F.2d at 334.

As will be made clear in the discussion that follows, the record is replete with circumstantial evidence that Licciardello, Standard, and Arzee were members of a conspiracy to boycott Rossi and drive him out of business. See infra S II.B.2.a. As the record also shows, Licciardello's threat was made during the conspiracy and in furtherance of it. We conclude therefore that Rossi has satisfied the preponderance standard with respect to all four requirements.

together, support the inference of a joint motive by the two defendants to unlawfully stabilize roofing prices in northern New Jersey. This motive is consistent with the motive behind the defendants' alleged boycott of Rossi Florence and Rossi Roofing -- that Standard and Arzee wanted to eliminate an uncooperative competitor who threatened to undercut their prices and destabilize the market. Rossi testified that sometime in 1986 or 1987, while he was still working for Standard (he was fired in September 1989), his boss at that time and chairman of Standard, Robert Higginson, directed him to attend a lunch with Al and Cary Roth of Arzee. According to Rossi, Robert Higginson told him that this lunch had been set up so that the two competitors could "cooperate" and share price information. Robert Higginson also told Rossi that Standard's other competitors had pricing agreements and that they were the only ones who were not participating. At the lunch, Al Roth proposed to Rossi a price-fixing scheme whereby Arzee and Standard would fix prices and divide up their large customers and jobs. Al Roth further explained to Rossi that he had maintained a similar arrangement with Allied concerning Certainteed products. Rossi rejected Al Roth's overtures, and Standard and Arzee did not, at that time, enter into an agreement to set prices.

The second Standard–Arzee meeting at which prices were discussed took place over the telephone in February of 1990. It involved a conversation between Licciardello, the manager at that time of Standard's Cedar Knolls branch, and Cary Roth, the manager of one of Arzee's local branches, regarding the price of GAF vinyl siding. Patrick Mulcahy, a former employee of Standard who overheard the conversation, recalled that Licciardello said to Cary Roth: "We really got to run this like a business and we all have to make a profit here. And we've got to keep certain price levels in order to do this."[12] This statement is remarkably

_____

12. Standard and Arzee both raise questions about whether this conversation actually took place. In addition to denying it, they point out
that Mulcahy did not hear the voice of the person on the phone, and only heard Licciardello talking to someone named "Cary." Mulcahy assumed the person on the other end of the line was Cary Roth. As this is before us on a motion for summary judgment, we conclude that, in a light most favorable to Rossi, a jury could infer that "Cary" was Cary Roth of Arzee.

similar to other statements that we have found probative of an agreement between competitors. See, e.g., Petruzzi's, 998 F.2d at 1236 ("[W]hy don't you put your prices in line and make money on what you have?").

Neither of these discussions took place during the period of the alleged conspiracy to boycott and exclude Rossi from the market; one took place before, and one after. Yet we reject Standard's and Arzee's contention that they are irrelevant to our decision. The two pieces of evidence, especially taken together, are probative of Standard's and Arzee's motive. Evidence that Standard's and Arzee's principals had actively considered fixing prices and allocating customers in 1986-87, and again in 1990, is sufficient to permit the inference that Standard and Arzee may have had a long-standing intent to stabilize prices in the roofing distribution business in northern New Jersey. See Big Apple BMW, 974 F.2d at 1360-61 (reviewing evidence outside of the statute of limitations and thus not part of the alleged conspiracy which nevertheless "demonstrat[ed] a pattern of conduct"); see also Andersen v. Maryland, 427 U.S. 463, 483-84 (1976) (proof of similar acts is admissible to show intent or the absence of mistake); Keyes v. School District No. 1, 413 U.S. 189, 207-08 (1973) (citing the well-settled evidentiary principle that " `the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent.' ") (quoting 2 J. Wigmore, Evidence 200 (3d ed. 1940)). Because Rossi was known to the defendants as a price-cutter and potent competitor who had refused to collude on prices in the past, this circumstantial evidence tends to link Standard's and Arzee's motives with their other actions in support of the boycott, which are detailed below.

The record is also replete with examples of high pressure recruitment, monitoring, and enforcement tactics undertaken by Standard and Arzee in furtherance of their efforts to prevent Rossi from purchasing roofing materials, particularly GAF product. There is evidence that Standard and Arzee put pressure on virtually everyone, including manufacturers, distributors, and even Rossi's prospective

32

business partner, Droesch, to convince them not to do business with Rossi. In December 1988, for example, Al Roth called Droesch, who had agreed to establish Rossi Florence and go into business with Rossi, and told him that he was not happy about Rossi competing against Arzee and that if Droesch proceeded with his plans to establish Rossi Florence with Rossi, Roth would open up an Arzee location on Long Island near Droesch's Florence business which was located there. Also in late 1988 and early 1989, representatives of several manufacturers told Rossi that they were being pressured not to deal with him or sell to Rossi Florence. Specifically, Rossi testified that representatives from Gold Bond, Wood Fiber, Bird Corporation, Homosote, Hi-Finn, Genstar, Vipco, and Hastings Aluminum, told him that they had been threatened by representatives of Standard. Similarly, representatives of Nailite and Certainteed claimed that they had been threatened by Arzee.[13]

There was evidence that after Rossi incorporated Rossi Roofing in early 1989, Standard's and Arzee's pressure on manufacturers and distributors continued. Joe Mullenhour of Bird Corporation told Rossi that Licciardello of Standard had threatened to drop Bird's vinyl siding if Bird Corporation sold to Rossi Roofing. Bill Higginson of Standard also spoke to Raymond Six of Gold Bond and told him that he was "disappointed" that Gold Bond had agreed to sell to Rossi Roofing. Six cut off the conversation because he was concerned by the antitrust implications of Bill Higginson's overtures. More specifically, Six told Higginson that he would not let the conversation go further because:

> Gold Bond had been in an anti-trust suit back in the 70's on gypsum. Every Gold Bond manager – well, I'll say every Gold Bond employee had been schooled, I'll say, from 1975 on, anyway, on what Robinson-Patman is, what Sherman anti-trust was. So the conversation wasn't going to go any further than what my statement to him was.

_____

13. While offered in hearsay form, we will consider these statements because they are capable of being admissible at trial, see Petruzzi's, 998 F.2d at 1234 n.9 (citations omitted), for Rossi has simply to produce the declarants to give the testimony. Id.

When Rossi asked Jim Hines of Hi-Finn to supply Rossi Roofing with the "Atlas" insulation line, he arranged for Rossi to buy the product indirectly through a middleman at a higher price. When Hines later visited Standard on a sales call, Licciardello told him, "You know why I can't do business with you." Hines replied that "if it has anything to do with the truck of Atlas insulation that Joe Rossi has in stock, that was purchased through another distributor, not directly through Atlas." Licciardello referred Hines to Bob Schaab, Standard's Controller, who told Hines to "[d]o what you want to." Based upon his experience with Schaab and his dealings with Standard, Hines testified that he concluded that conversation with "the feeling that his implication may have been that, if I sold to Joe [Rossi], he definitely wouldn't buy from me." Finally, Hines testified that his business with Standard fell off right around the time that Rossi purchased the Atlas insulation from the middleman recommended by Hines. On this evidence, a fact finder could reasonably draw the inference that Licciardello had threatened Hines to ensure Hi-Finn's cooperation in the boycott of Rossi, and that, when Hines rebuffed him, Standard punished Hines and Atlas by cutting off future purchases.

Similarly, Rick Fiore, an employee of roofing manufacturer Certainteed, told Rossi that Cary Roth of Arzee had pressured him and threatened to sue Certainteed if it sold to Rossi Roofing. Robert Qualik of Nailite informed Rossi that Arzee had told Nailite not to sell to Rossi Roofing and that "[Arzee] had blocked [Rossi Roofing] from getting product on a particular job right around the corner from us." Also, Karl Loser of Wood Fiber told Rossi that he was receiving a lot of pressure from Standard not to sell Structodek FS, a Wood Fiber product, to Rossi Roofing.

In an effort to circumvent these supply problems arising from his efforts to buy directly from manufacturers, Rossi attempted to purchase product through other distributors, even though this would cost more. For example, Rossi was able to convince Passaic Metals, a roofing and siding distributor in northern New Jersey, to sell him some GAF product. In response, Bill Higginson of Standard called his competitor, Frank Gurtman, the president of Passaic

34

Metals, and threatened to open a branch near Passaic
Metals and take away all of his customers if Gurtman
continued to sell to Rossi.

There is also evidence that Standard and Arzee went to
great lengths to monitor Rossi Roofing. The record indicates
that Licciardello ordered Keith Cogley and Jorge Esteves to
report to him the comings and goings of all roofing
materials at Rossi Roofing. All three closely watched Rossi's
premises on a daily basis to determine what kinds of
products Rossi was able to purchase and from where they
might be coming. Cary Roth and Ed Jacobitz of Arzee also
frequently monitored Rossi Roofing by sitting in their cars
in a cul-de-sac adjacent to Rossi's premises.

In addition, there is evidence that Standard even reported
back to GAF when its employees saw GAF product on
Rossi's premises to assist GAF in enforcing the boycott.
Former GAF district manager Licciardello, then working for
Standard, admitted that after seeing GAF product on
Rossi's premises, he called Bob Gessner of GAF to confirm
that GAF was still not selling to Rossi. On another
occasion, when a load of GAF was sitting out in front of
Rossi Roofing, Gessner said to Licciardello, "I thought we
weren't selling him," to which Licciardello responded "we're
not."

When Standard's Cogley saw a load of GAF product at
Rossi Roofing, Licciardello called GAF to find out how Rossi
had procured the product. Someone at GAF told
Licciardello that the load was not for Rossi Roofing, but
that it was being transported on a Jentar truck, and was
simply stopping overnight at 8 East Frederick Place, where
both Jentar Trucking and Rossi Roofing had offices. Later,
after Licciardello learned that Rossi Roofing had purchased
GAF product from Servistar through his Far Hills account,
see infra S II.B.2.c, Licciardello told Standard employee
Esteves that " `That's the last time we're going to be seeing
any GAF across the street.' They got the -- they were
getting the loads through [Far Hills], which is [Servistar].
That's how Joe Rossi was getting GAF and he's
[Licciardello's] going to put an end to that. `Never going to
see another GAF load across the street.' "

35

While this monitoring and reporting activity would not in isolation be probative of a conspiracy, in the context of the pressure and enforcement tactics described above, the direct evidence that Standard and Arzee had talked about and agreed to boycott Rossi Florence and Rossi Roofing, and the circumstantial evidence of motive, certain inferences can be drawn from this evidence. To enforce a boycott, Standard and Arzee would need to monitor carefully the supplies Rossi was able to procure, communicate to cooperating manufacturers any evidence that Rossi had been able to circumvent the boycott, and bring pressure on any non-cooperating manufacturers or distributors that refused to participate in the conspiracy. Here, Rossi has adduced evidence of exclusive monitoring by both Standard and Arzee, and evidence that Licciardello could "put an end" to Rossi receiving GAF product. Viewed in conjunction with the evidence that Standard and Arzee pressured many manufacturers and distributors, this monitoring and reporting activity also supports an inference that Rossi's two primary competitors were jointly attempting to establish a market-wide boycott of Rossi Roofing.

We emphasize that we would not consider the evidence that Standard and Arzee aggressively monitored Rossi Roofing (and even reported the substance of those observations to GAF), without more, sufficient to satisfy Rossi's burden in opposing summary judgment. However, in conjunction with all of the other pieces of circumstantial evidence Rossi has adduced, we believe that this monitoring and reporting activity represents an important thread to be considered in the complicated tapestry of conspiracy that Rossi weaves.

Looking at all of the evidence Rossi has assembled against Standard and Arzee, we conclude that he has satisfied his burden in opposing summary judgment on the concerted action prong. First, Rossi has developed direct evidence that Standard and Arzee had, both before and after Rossi Roofing existed, attempted to conspire to fix prices, allocate customers, and otherwise stabilize the roofing and siding distribution market in northern New Jersey. He has also shown that both defendants knew him

36

to be a price-cutting competitor who had frustrated their unlawful purposes by refusing to cooperate with them. These two facts provide strong evidence of the defendants' motive to conspire against Rossi. Desiring to raise prices above their competitive levels in a highly competitive market, an inference is supported that Standard and Arzee were concerned that they could not succeed without Rossi's cooperation, and that they therefore decided to prevent him from competing against them.

Next, Rossi points us to direct evidence of the boycott, namely Licciardello's threat on behalf of Standard and Arzee to cut off his supplies and put him out of business. Finally, Rossi has developed considerable evidence of Standard's and Arzee's elaborate efforts to enforce the boycott. Rossi has produced testimony that many manufacturers and distributors were pressured and/or threatened not to do business with Rossi Florence and Rossi Roofing. He has also adduced testimony that Standard and Arzee had an elaborate monitoring system in place, one which even included reporting back to GAF to help enforce the boycott.

To be sure, this evidence is far from conclusive. It could be found at trial that Standard, Arzee, and GAF were all acting independently of one another in parallel efforts to do Rossi in. However, given the comprehensive nature of the evidence covering all elements of the group boycott Rossi alleges, we must reverse the district court's order granting summary judgment in favor of Standard, Arzee, Robert Higginson, William Higginson, the Roths, and Licciardello.

    b. GAF

We also believe that Rossi has adduced sufficient evidence that GAF acted in concert with Standard and Arzee to survive its motion for summary judgment and will reverse the district court with respect to GAF as well.

    (1) Matsushita Implausibility

GAF's first defense, like Standard's and Arzee's, is that the conspiracy alleged by Rossi is implausible under Matsushita. Because Licciardello's statement that Standard

37

and Arzee intended to establish a boycott of Rossi Roofing is insufficient by itself to hold in GAF, and we can find no (other) direct evidence of GAF 's participation in the alleged conspiracy in the record, we must analyze, under the Matsushita standard, the plausibility of the conspiracy that Rossi alleges. See supra S II.B.2.a. In contrast with that case, we find that the theory Rossi advances with respect to GAF 's motivations and participation in the conspiracy is not economically implausible.

First, Rossi's claim does not, as defendants allege, require the cooperation of dozens of distributors and manufacturers (each selling different quantities of comparable competing products) in the northern New Jersey marketplace to succeed (i.e. for distributors Standard, Arzee, and Allied to be able to charge supra-competitive prices). Rather, it is primarily focused on the actions of three distributors, Standard, Arzee, and Allied, and one manufacturer, GAF. Despite the fact that this case arises against the backdrop of the highly competitive, price-sensitive roofing and siding industry in northern New Jersey in 1989 and 1990, Rossi advances a plausible theory of how these defendants could have unlawfully conspired to fix prices and therefore why they would want to boycott Rossi. Moreover, even if Standard and Arzee were not conspiring to keep prices artificially inflated by pocketing the secret rebates that their competitors were not receiving, both still had a plausible motive to keep Rossi, an avowed and experienced price-cutter and acknowledged potent competitor with a reputation among their customers for excellent service, from opening up a competing distributorship next door.

In order to comprehend the plausibility of the conspiracy Rossi alleges, it is necessary to understand GAF's position in the market and the importance of GAF product. In 1990, GAF was indisputably one of the largest and most important manufacturers of roofing supplies in the northern New Jersey market, with an estimated 38% share of the entire residential roofing shingle market in New Jersey and an estimated 71% share of the residential roofing laminate shingle market in New Jersey. GAF not only supplied a large percentage of the overall market, but

38

it also was Standard's single largest supplier during the time that Rossi was a manager there. As such, Rossi was extremely familiar with GAF, and a large percentage of his customers, many of whom followed him from Standard to Rossi Roofing, had a strong preference for GAF product. Indeed, there is substantial testimony in the record from many sources supporting Rossi's contention that GAF product was critical to both Rossi Florence's and Rossi Roofing's success in the market.

For example, Sean Coffey, one of the five largest residential roofers in northern New Jersey, testified that he used GAF product in 1989 and 1990 almost exclusively and would not buy from any roofing distributor that did not have access to it. Similarly, Francis Doherty, proprietor of another large roofing business in northern New Jersey, testified that "99 percent" of his strip shingle purchases had been GAF product. John Feher, another roofer who attempted to purchase GAF product from Rossi Roofing, testified that GAF was very popular with everyone, including contractors and homeowners, because "it's easy to get and guarantees [sic] and everything is good on it." Thomas Harnett, an executive at Bird Corporation, testified that GAF "dominated all levels of roofing in New Jersey," and that it was a "highly desirable product."

Likewise, Albert Logan, a former Celotex employee, stated that GAF had "dominate[d] the market for years," representing at least fifty percent of every distributor's inventory. John Mulcahy, a former Standard employee, also testified that GAF was "dominant and had . . . [its] product[s] so well-established in the area." Because of this, Mulcahy stated that any distributor denied access to GAF product would have difficulty competing in the residential shingle market. Id. When asked to describe the magnitude of the adverse impact of trying to compete without GAF product, Mulcahy stated, "It would be like a beer distributor not having Budweiser."